**[J-15-2014]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.**


SEIU HEALTHCARE PENNSYLVANIA;
MELANIE ZEIGLER; KATHERINE
BRODALA; JOANNE NAMEY; JON ANN
FREDERICKS; WENDY HOKE; STATE
SENATOR TIMOTHY J. SOLOBAY;
STATE SENATOR JOHN N. WOZNIAK;
STATE REPRESENTATIVE MICHAEL K.
HANNA; STATE REPRESENTATIVE TED
HARHAI; STATE REPRESENTATIVE
PAM SNYDER,

                Appellants


                v.


COMMONWEALTH OF PENNSYLVANIA;
THE HONORABLE THOMAS CORBETT,
GOVERNOR OF THE COMMONWEALTH
OF   PENNSYLVANIA; THE
PENNSYLVANIA DEPARTMENT OF
HEALTH; MICHAEL WOLF, SECRETARY
OF HEALTH,

                Appellees

AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, COUNCIL 13, AFL-CIO, BY
ITS TRUSTEE AD LITEM, DAVID R.
FILLMAN; KELLY LINKO,

                Intervenors

FEDERATION OF STATE CULTURAL
AND EDUCATIONAL PROFESSIONALS,
LOCAL 2382, AMERICAN FEDERATION
OF TEACHERS PENNSYLVANIA,

: No. 38 MAP 2013
:
: Appeal from the order of the
: Commonwealth Court at No. 150 M.D.
: 2013 dated April 25, 2013.
:
: ARGUED:   March 12, 2014

AFL-CIO, BY ITS TRUSTEE AD LITEM,    :
WILLIAM F. BERTRAND,                  :
                                      :
             Intervenors              :

## OPINION

**MR. JUSTICE BAER**                    **DECIDED:   November 20, 2014**

This is a direct appeal from the Commonwealth Court's order dated April 25, 2013, denying a request for a preliminary injunction to prevent the closure of twenty-six State Health Centers ("Centers") and the furloughing of approximately twenty-six nurse consultants employed by those Centers.[1] For the reasons set forth herein, we discern no reasonable ground for the denial of injunctive relief, and, accordingly, reverse the order of the Commonwealth Court.

To carry out its statutory duty to protect the health of Pennsylvania citizens and determine and employ the most efficient and practical means for the prevention and suppression of disease, 71 P.S. §§ 532(a) and 1403(a), the Pennsylvania Department of Health ("DOH") oversees the administration of public health services to residents of Pennsylvania's sixty-seven counties. This has historically been done through a system

---

[1] By order dated July 17, 2013, we granted Appellants an injunction pending appeal pursuant to Pa.R.A.P. 1732, which requires a showing of a likelihood of success on the merits, irreparable harm, and that no substantial harm or adverse public effect will result from granting the injunction. See Commonwealth, PUC v. Process Gas Co., 467 A.2d 805, 808-9 (Pa. 1983). An injunction pending appeal is applicable only during the period of appeal while a preliminary injunction, which is sought herein, would apply through a court's decision on the merits of a permanent injunction. See e.g. Appeal of Little Britain Twp. From Decision of Zoning Hearing Bd. of Little Britain Twp., Lancaster County, Pa., 651 A.2d 606, 611 (Pa. Cmwlth. 1994), appeal denied 663 A.2d 696 (Pa. 1995) (observing that a preliminary injunction cannot serve as judgment on the merits because by definition it is a temporary remedy granted until that time when the party's dispute can be resolved completely).

of sixty Centers located throughout the Commonwealth. The Centers employed, *inter alia*, approximately sixty-one nurse consultants, who have expertise in a variety of specialized public health fields involving tuberculosis, communicable diseases, immunizations, HIV, family health, tobacco, cancer, and injury prevention. The nurse consultants support public health services and provide coordination and consultation for the community health nurses who administer care at the Centers.

In 1996, the General Assembly enacted legislation, Act 87, addressing the DOH's operation of the Centers and its administration of public health services. Specifically relevant here, Subsection 8 of Act 87, codified at 71 P.S. § 1403 (hereinafter "Section 1403"), is entitled "Duty to protect health of the people," and included various directives to the DOH. One of these directives was to establish a pilot review program to determine the feasibility of privatizing the operation of three state health centers, which program would terminate after twelve months, at which point the DOH could submit to the Legislature a report and recommendation regarding the privatization and operation of all remaining health care services. See 71 P.S. § 1403(c)(2) (expired pursuant to Act of July 2, 1996, P.L. 518, No. 87 § 4); § 1403(c)(4). After implementing the pilot review program, the DOH ultimately decided not to maintain the three private health centers, and converted the facilities back to public health centers.

More than fifteen years later, in 2013, the DOH announced that, pursuant to an extensive reorganization of public health services referenced in Governor Tom Corbett's 2013-2014 budget, twenty-six Centers would be closed and approximately twenty-six nurse consultants would be furloughed. In response, on April 1, 2013, a lawsuit was filed in Commonwealth Court's original jurisdiction by Appellants SEIU Healthcare Pennsylvania, an unincorporated labor organization, five nurses employed by the Centers and represented by SEIU, and five Pennsylvania state legislators (collectively

referred to as "SEIU"), seeking injunctive and declaratory relief. Specifically, SEIU sought to prevent Appellees, the Commonwealth of Pennsylvania, Governor Corbett, the DOH, and DOH Secretary, Michael Wolf (collectively referred to as "the Executive Branch"), from closing the Centers and furloughing the nurse consultants.

SEIU alleged that the closings and furloughs violated 71 P.S. § 1403(c)(1), which was part of Act 87, discussed, infra. Section 1403(c)(1) provides:

> With the exception of the three State health centers selected for the review program established in paragraph (2) [2] [currently expired], the department shall operate those public State health centers and provide at a minimum those public health services in effect as of July 1, 1995. Except as provided in paragraph (2) [currently expired], the department shall not enter into contracts with any additional private providers that would result in the elimination of any State health center nor reduce the scope of services currently provided nor reduce the number of centers.

71 P.S. § 1403(c)(1).

SEIU alleged in its complaint that the plain language of the first sentence of Section 1403(c)(1) requires the Commonwealth to continue to offer the same level of

---

[2] Paragraph (2), which expired on December 31, 1997, provided:

> The department shall establish a review program to determine the feasibility and effectiveness of entering into contracts with local health care providers for the operation of State health centers or the provision of equivalent services. The program shall utilize the equivalent services provided by three existing State health centers on the effective date of this act, one of which shall be in an urban area of this Commonwealth, one of which shall be in a suburban area of this Commonwealth, and one of which shall be in a rural area of this Commonwealth, as determined by the department. The review program shall begin on November 1, 1996, and shall continue for a period of twelve months.

71 P.S. § 1403(c)(2) (expired pursuant to Act of July 2, 1996, P.L. 518, No. 87, § 4).

public health services and operate the same number of Centers that existed on July 1, 1995, *i.e.*, sixty. Unless and until the statute is amended, it argued, the DOH is statutorily required to operate the Centers at the current level. Consequently, SEIU contended, the plan to eliminate twenty-six Centers and furlough twenty-six nurse consultants constituted an unequivocal violation of the express terms of the statute.[3]

In its answer to SEIU's complaint, the Executive Branch denied that Section 1403(c)(1) requires the DOH to continue to operate all Centers in existence as of July 1, 1995. Rather, it argued, the focus of the provision was exclusively to prevent the closure of Centers as a result of privatization. Under the proffered modernization plan, the Executive Branch contended, the DOH was not privatizing health services, but was alternating its methodology for delivering public health services so that the services could be continued in a more efficient manner. Thus, the Executive Branch concluded, Section 1403(c)(1) was not implicated.

In addition to filing their lawsuit in the Commonwealth Court's original jurisdiction, SEIU also filed a motion for a temporary restraining order and preliminary injunctive relief. The Commonwealth Court denied the motion for a temporary restraining order the day after it was filed.[4] Following a two-day hearing on SEIU's motion for preliminary injunctive relief, the Commonwealth Court, by order dated April 25, 2013, denied the

---

[3] SEIU also asserted in its complaint that the planned closures and furloughs violate Article II, Section 1 and Article I, Section 12 of the Pennsylvania Constitution, which, respectively, vests legislative power in the General Assembly and gives it the power to amend, repeal, suspend or enact statutes. SEIU argued that, because the Legislature mandated the number of required Centers and the minimum level of public health services in Section 1403(c)(1), the Executive Branch's plan to alter this mandate violates the separation of powers.

[4] In all matters pertinent hereto, the Commonwealth Court acted through a single senior judge, the Honorable Keith B. Quigley.

request without elaboration of its rationale in its order. After SEIU filed a notice of appeal to this Court, the Commonwealth Court directed SEIU to file a Pa.R.A.P. 1925(b) statement of matters complained of on appeal. Thereafter, on May 24, 2013, the court filed a memorandum opinion in support of its denial of preliminary injunctive relief.[5]

Notwithstanding that an evidentiary hearing had been conducted, the Commonwealth Court set forth no findings of fact in its May 24, 2013 opinion. Initially, it observed that a preliminary injunction is intended to preserve the *status quo*, and prevent imminent and irreparable harm that might occur before the merits of a case can be heard and determined. The court cited the following elements to establish entitlement to preliminary injunctive relief: (1) the relief is necessary to prevent irreparable harm to the movant; (2) the injunction would restore the parties to the *status quo* as it existed before the alleged wrongful act; (3) greater injury would result from a refusal to grant the injunction than from granting it; and (4) the movant's right to relief is clear. SEIU Healthcare Pa. v. Commonwealth, No. 150 MD 2013, unpublished memorandum at 2 (Pa. Cmwlth. filed May 24, 2013) (citing T.W. Phillips Gas and Oil Co. v. Peoples Natural Gas Co., 492 A.2d 776 (Pa. Cmwlth. 1995)).

Focusing exclusively on whether SEIU's right to relief was clear based on the legal argument that Section 1403(c)(1) precludes the Commonwealth from closing the Centers and/or decreasing the public health services offered, the Commonwealth Court opined, without further analysis, as follows:

---

[5] In the meantime, after filing a notice of appeal with this Court from the denial of preliminary injunctive relief, SEIU, on May 17, 2013, asked this Court to enter an injunction pending appeal pursuant to Pa.R.A.P. 1732. We denied this request without prejudice, observing that it should have first been made in the lower court. SEIU thereafter requested the Commonwealth Court to grant an injunction pending appeal, which was again denied. SEIU then properly sought an injunction pending appeal from this Court, and we entered an order on July 17, 2013, granting this second application.

Based on our reading of Act 87 and the arguments of counsel, we were not persuaded that the Act mandates the Department of Health to maintain staffing levels as they were on or about April 30, 1999. Stated another way, Act 87 cannot be read, in our opinion, to prevent the executive, through the Department of Health, from exercising his discretion to provide health services to the citizens of the Commonwealth through the most effective and practicable means available.

While the Court empathizes with those individuals who may be moved from their present positions or, worse yet, furloughed, the fact remains that Act 87 does not prohibit the actions of the executive or the Department of Health and for these reasons the motion for preliminary injunctive relief was denied.

Id. at 2-3. The court did not discuss SEIU's plain language interpretation of Section 1403(c)(1) or review any other requisites for obtaining a preliminary injunction.

SEIU thereafter filed a direct appeal in this Court, which is now before us for disposition.[6] We keep in mind that an appellate court reviews an order granting or denying a preliminary injunction for an abuse of discretion. Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc., 828 A.2d 995, 1000 (Pa. 2003). Under this highly deferential standard of review, an appellate court does not inquire into the merits of the controversy, but examines the record "to determine if there were any apparently reasonable grounds for the action of the court below." Id., (quoting Roberts v. Board of Dirs. of Sch. Dist., 341 A.2d 475, 478 (Pa. 1975)). "Apparently reasonable grounds" exist to support a lower court's denial of injunctive relief where the lower court has

_____

[6] The Commonwealth Court's order denying SEIU's preliminary injunction is appealable to this Court as of right pursuant to Pa.R.A.P. 311(a)(4) (providing than an appeal may generally be taken as of right from an order that grants or denies an injunction); see also 42 Pa.C.S. § 723(a) (providing that this Court shall have exclusive jurisdiction of appeals from final orders of the Commonwealth Court entered in any matter originally commenced in that court).

properly found that any one of the six "essential prerequisites" for a preliminary injunction is not satisfied. Id. at 1002.[7]

The six essential prerequisites that a moving party must demonstrate to obtain a preliminary injunction are as follows: (1) the injunction is necessary to prevent immediate and irreparable harm that cannot be compensated adequately by damages; (2) greater injury would result from refusing the injunction than from granting it, and, concomitantly, the issuance of an injunction will not substantially harm other interested parties in the proceedings; (3) the preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; (4) the party seeking injunctive relief has a clear right to relief and is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and, (6) the preliminary injunction will not adversely affect the public interest. Warehime v. Warehime, 860 A.2d 41, 46-47 (Pa. 2004) (citing Summit Towne Centre, Inc., 828 A.2d at 1001)).

Acknowledging the limited standard of appellate review, SEIU contends that the Commonwealth Court's denial of its request for a preliminary injunction should be reversed. It submits there are no apparently reasonable grounds for the Commonwealth Court's denial of the preliminary injunction because the unambiguous language of Section 1403(c)(1) prohibits the conduct it seeks to enjoin. SEIU argues that the Commonwealth Court's interpretation of the statute, affording the Executive Branch discretion to reduce the number of Centers and the level of public health services provided, overlooks the unambiguous "shall operate" language, which mandates expressly that the DOH shall operate the number of Centers and provide the level of

---

[7] This Court's scope of review in preliminary injunction matters is plenary. Warehime v. Warehime, 860 A.2d 41, 46 n.7 (Pa. 2004).

public health services that existed as of July 1, 1995.[8]  SEIU emphasizes that when the words of a statute are free from ambiguity, the letter of the statute cannot be disregarded under the pretext of pursuing its spirit. 1 Pa.C.S. § 1921(b).  Further, it submits, the phrase "shall operate" should be construed according to its common and approved usage, id. § 1903, requiring the DOH to operate those Centers and provide, at a minimum, those services in existence in July of 1995.

SEIU further proffers two arguments to refute the Executive Branch's position that Section 1403(c)(1) prevents only the closure of Centers due to privatization, and does not preclude implementation of the planned reorganization of public health services.  First, SEIU points out that if the provision was intended to curb only closures of Centers due to privatization, the second sentence of Section 1403(c)(1) would accomplish that task as it states, "the [DOH] shall not enter into contracts with any additional private providers that would result in the elimination of any State health center nor reduce the scope of services currently provided nor reduce the number of centers."  71 P.S. § 1403(c)(1).  However, SEIU emphasizes, Section 1403(c)(1) is not limited to that prohibition.  Rather, as noted, the first sentence states that, with the exception of the three Centers privatized in the now-expired pilot program, "the [DOH] shall operate those public State health centers and provide at a minimum those public health services in effect as of July 1, 1995."  Id.  This language, SEIU contends, goes beyond prohibiting closures of Centers due to privatization, and declares a clear legislative intent to prohibit the closure of Centers and the reduction of public health services for any reason.  It emphasizes that in construing a

---

[8] SEIU clarifies that it is not contending that the sixty Centers must continue in the exact buildings where they were located in July of 1995, as many of the premises were leased from non-governmental entities over which the DOH would have no control.  Rather, SEIU's position is that the number of Centers, *i.e.*, sixty, must remain the same and serve the same counties.

statute, courts must attempt to give meaning to every word, as it is not to be assumed that the legislature intended any language to be mere surplusage. 1 Pa.C.S. §§ 1921(a), 1922(2). SEIU concludes that the Commonwealth's narrow interpretation of Section 1403(c)(1) violates these principals of statutory construction, rendering the first sentence of the provision meaningless.

Second, SEIU contends the interpretation of Section 1403(c)(1) proffered by the Executive Branch is contrary to language in Section 1403(c)(4), which requires the DOH to submit a report to the General Assembly comparing the cost and effectiveness of the three privatized Centers with the equivalent services provided by local health care providers and make recommendations to the General Assembly relating to the public and private operation of all remaining Centers.[9] SEIU contends that by requiring the DOH to

---

[9] Specifically, Section 1403(c)(4), provides that "[o]n or before December 31, 1997, the department shall submit a report to the General Assembly, which shall include, but not be limited to, the following:

(i) A review and analysis of the three health care centers or of the provision of equivalent services in the review program, including patient utilization and services provided.

(ii) An analysis of the performance of each local health care provider, including patient satisfaction with the provision of services.

(iii) A review of other delivery systems for health services in the community, both public and private.

(iv) A comparison of the cost and effectiveness of the operation of each of the three health care centers by the Commonwealth with the cost of the provision of equivalent services by local health care providers.

(v) Recommendations regarding continuation of the provision of the services previously provided by the three health care centers included in the study program by local health care providers.

(continued…)

submit recommendations to the General Assembly regarding the operation of the Centers, the Legislature made the policy decision to reserve exclusively to itself the authority to reduce the existing Centers as part of any new plan for providing public health services in Pennsylvania.

Accordingly, SEIU concludes, the only basis for the Commonwealth Court's denial of the preliminary injunction, *i.e.,* that SEIU was unlikely to prevail on the merits, was based upon an erroneous application of the law and warrants reversal. See County of Allegheny v. Commonwealth, 490 A.2d 402, 414 (Pa. 1985) (acknowledging that the denial of a preliminary injunction can be reversed on appeal based upon the lower court's erroneous application of law).[10]

Additionally, presuming that the closing of the Centers and the elimination of the nurse consultant positions violates Section 1403(c)(1), SEIU contends that the denial of the preliminary injunction should be reversed on constitutional grounds because the Executive Branch's flagrant disregard of Act 87 violates Article II, § 1 of the Pennsylvania

---

(…continued)

> (vi) Recommendations regarding the public and private operation of all remaining health care centers or the provision of equivalent services in this Commonwealth."

71 P.S. § 1403(c)(4).

[10] Alternatively, SEIU argues that if the court finds the statute ambiguous, consideration of the canons of statutory construction set forth at 1 Pa.C.S. § 1921(c), particularly the occasion and necessity for the statute and the contemporaneous legislative history, would also lead one to conclude that Section 1403(c)(1) was intended to ensure that the DOH maintain the number of Centers and the level of public health services existing on July 1, 1995.

Constitution, which vests legislative power in the General Assembly,[11] and Article I, § 12, which affords the General Assembly exclusive authority to suspend laws.[12] SEIU argues there is no statutory language delegating authority to the DOH to reduce the number of Centers or decrease the level of public health services, or to suspend Section 1403(c)(1)'s mandate that the same number of Centers and level of public health services be maintained.

Finally, addressing the remainder of the requisites for establishing entitlement to a preliminary injunction, SEIU argues that the Executive Branch's violation of both a state statute and the Pennsylvania Constitution results in *per se* irreparable harm that cannot be compensated adequately by damages because the General Assembly already balanced the equities of the matter by enacting Section 1403(c)(1), and declaring that the Centers should not be closed and the public health services should not be decreased. See Milk Marketing Board v. United Dairy Farmers Co-op Association, 299 A.2d 191 (Pa. 1973) (plurality) (affirming issuance of a preliminary injunction and finding irreparable harm because Petitioners violated state statute by selling milk below the minimum prices mandated by state law); Pennsylvania Public Utility Commission v. Israel, 52 A.2d 317 (Pa. 1947) (affirming issuance of a preliminary injunction on the basis that Petitioners violated a state statute requiring taxicabs to have a certificate of public convenience); Commonwealth ex rel. Corbett v. Snyder, 977 A.2d 28 (Pa. Cmwlth. 2009) (affirming issuance of a preliminary injunction and finding that irreparable harm was presumed where there was a credible violation of the consumer protection law). It further submits

---

[11] Article II, Section 1 guarantees that the "legislative power of the Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." PA. CONST. art. II, § 1.

[12] Article I, Section 12 states that "[n]o power of suspending laws shall be exercised unless by the Legislature or by its authority." PA. CONST. art. I, § 12.

that the injunctive relief requested merely restores the *status quo* of maintaining sixty Centers offering Pennsylvania citizens the same minimum level of public health services that has existed for years.

In response, the Executive Branch views this action as a challenge to its authority to make operational decisions regarding agency administration during difficult economic times. Emphasizing our limited standard of appellate review, it contends there are clearly "apparently reasonable grounds" supporting the Commonwealth Court's denial of the preliminary injunction because SEIU failed to demonstrate the prerequisites for a preliminary injunction.

Addressing the prong requiring the moving party to demonstrate its likelihood of success on the merits, the Executive Branch contends that the lower court properly interpreted Section 1403(c)(1). As it did below, it submits that the statute only precludes the DOH from closing Centers to allow public health services to be delivered by private providers; it does not address any other reason the DOH may have for closing or consolidating Centers. In the Executive Branch's opinion, Section 1403(c)(1) does not prevent the DOH from altering the mechanism by which it delivers public health services, and does not mandate the maintenance of staffing levels or the size or location of the Centers. The only focus of Section 1403(c)(1), it submits, is on the provision of public, as opposed to private, health services.

The Executive Branch asserts that the DOH must be afforded wide latitude to carry out its statutory duty to protect the health of Pennsylvanians and to determine and employ the most efficient and practical means for the prevention and suppression of disease. 71 P.S. §§ 532(a) and 1403(a). In this regard, it contends, the evidence adduced at the preliminary injunction hearing established that the DOH would continue to fulfill its obligations under the law, despite the reallocation of resources, and would continue to

operate in each county that contained a Center on July 1, 1995, albeit under a different organizational structure. It asserts that the modernization plan, incorporating the closing of twenty-six Centers and the elimination of twenty-six nurse consultant positions, maintains the core clinical services the Centers previously provided, with a cost savings of over five million dollars.[13]

According to the Executive Branch, adoption of SEIU's statutory interpretation of Section 1403(c)(1) would "handcuff the [DOH's] ability to innovate and find new ways to combat existing and, more importantly, newly emerging public health threats." Brief for Appellees at 13-14. By limiting where and how those services are to be performed, it asserts, the aim of providing public health services in the most effective and practical means will be frustrated.[14]

The Executive Branch further refutes SEIU's contention that the denial of the preliminary injunction should be reversed on constitutional grounds. It submits that by consolidating various Centers, the Executive Branch is neither usurping the General Assembly's legislative powers in violation of Article II, Section 1, nor suspending the operation of law in violation of Article I, Section 12. Because the DOH is authorized by the Legislature to employ the most efficient and practical means to prevent and control the spread of disease pursuant to 71 P.S. §§ 532(a) and 1403(a), supra, it contends that

---

[13] We reiterate that the Commonwealth Court neither accepted nor rejected this factual assertion because, as noted, it made no findings of fact, but rather concluded, as a matter of law, that Section 1403(c)(1) did not prohibit the DOH from closing Centers or changing the level of public health services offered.

[14] To the extent this Court finds the language of Section 1403(c)(1) to be ambiguous, the Executive Branch maintains, the legislative history of the statute supports, rather than refutes, its position that the statute was intended only to prevent the DOH from privatizing the delivery of public health services.

the DOH already possesses the authority to implement the modernization plan, and is not exercising an independent "legislative power."  The Executive Branch also submits that no action has been taken that could be considered a repeal, suspension or amendment of Section 1403(c)(1).  To the contrary, it maintains, the statute is still in effect because no Centers are being consolidated due to privatization, and there will be no reduction in the scope of services the DOH will be providing.[15]

Finally, the Executive Branch contends that SEIU failed to satisfy the remaining requisites for obtaining a preliminary injunction.  Regarding the immediate and irreparable harm prong, it distinguishes case law that presumes irreparable harm where the offending activity violates statutory law, contending there is no statutory violation here because the closings did not result from the privatization of public health services. Further, the Executive Branch submits that greater injury would result from issuance of the injunction than from refusing it because it presented evidence of insufficient funds to maintain the Centers' current lease payments and personnel costs.  It argues that if consolidations of Centers do not occur, reductions in the workforce would be necessary, which would impact adversely the delivery of public health services in the Commonwealth.

Having considered the parties arguments, we proceed to examine the record to determine if there were any apparently reasonable grounds supporting the Commonwealth Court's denial of the preliminary injunction.  Summit Town Centre, Inc., 828 A.2d at 1000.  We reiterate that "apparently reasonable grounds" exist to support a lower court's denial of injunctive relief where the lower court has properly found that any one of the six prerequisites for a preliminary injunction is not satisfied.  Id. at 1002.

---

[15] Again, we emphasize that the veracity or accuracy of these facts have not been assessed, as the Commonwealth Court made no factual findings before issuing its decision.

Because the parties' focus in this appeal is on whether SEIU has a clear right to relief and is likely to prevail on the merits of the underlying action, we address that prong first.

## I. Clear Right to Relief

To establish a clear right to relief, the party seeking an injunction need not prove the merits of the underlying claim, but need only demonstrate that substantial legal questions must be resolved to determine the rights of the parties. Fisher v. Dep't of Public Welfare, 439 A.2d 1172 (Pa. 1982). Under the facts presented, resolution of this prong is based entirely upon the statutory interpretation of Section 1403(c)(1).

As with any question of statutory interpretation, our standard of review is *de novo*, and our scope of review is plenary. Mercury Trucking, Inc. v. Pa. Pub. Util. Comm'n, 55 A.3d 1056, 1067 (Pa. 2012). In interpreting a statute, our primary goal is "to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." Id. § 1921(b). Additionally, we construe every statute "if possible, to give effect to all its provisions." Id. § 1921(a); see also 1 Pa.C.S. § 1922(2) ("the General Assembly intends the entire statute to be effective and certain).

Contrary to the Commonwealth Court's determination, we find that SEIU demonstrated a clear right to relief because the unambiguous language of Section 1403(c)(1) prohibits the offending conduct sought to be prevented by the preliminary injunction, *i.e.*, the closing of twenty-six Centers and the furlough of twenty-six nurse consultants. As noted, Section 1403(c)(1) provides:

> With the exception of the three State health centers selected for the review program established in paragraph (2) [currently expired], the department shall operate those public State health centers and provide at a minimum those public health services in effect as of July 1, 1995. Except as provided in paragraph (2) [currently expired], the department shall not

enter into contracts with any additional private providers that would result in the elimination of any State health center nor reduce the scope of services currently provided nor reduce the number of centers.

71 P.S. § 1403(c)(1).[16]

The clear and unambiguous language of the first sentence of this provision has two mandates: (1) that the DOH operate "those public State health centers" that existed as of July 1, 1995, with the exception of three identified Centers subject to privatization under the expired pilot program; and (2) that the DOH provide "at a minimum those public health services in effect as of July 1, 1995." 71 P.S. § 1403(c)(1).[17] Contrary to the

---

[16] For purposes of context, Section 1403 is entitled, "Duty to protect health of the people." Subsection (a) sets forth the general duty of the DOH to protect the health of Pennsylvanians and to determine and employ the most efficient means for the prevention of disease. 71 P.S. § 1403(a). Subsection (b) directs the Secretary of the DOH to examine questions affecting the security of life and health, and provides authority to survey enumerated places throughout the state to carry out this duty. Id. § 1403(b). Subsection (c) addresses privatization of public health services and the scope of public health services to be maintained. Subsections (c)(2) and (c)(3), which set forth the privatization pilot program, expired on December 31, 1997. Significantly, when it "sunset" subsections (c)(2) and (c)(3), the General Assembly left intact subsection (c)(1), the language of which is at issue here. As noted, Subsection (c)(4), set forth supra at n.9, which was also left intact after the expiration of the provisions regarding the pilot privatization program, directs the DOH to make recommendations to the General Assembly regarding the propriety of privatization of health services and the public and private operation of all remaining health centers. Subsection (d) directs the DOH to maintain and operate a State Public Health Laboratory, and subsection (e) directs the DOH to create state dental health districts administered by a public health dentist. Id. § 1403(d), (e).

[17] The dissent posits that the minimum standard established by Section 1403(c)(1) concerns the public health services available, and not the number of centers providing them. Respectfully, this interpretation is not persuasive because it ignores that the Legislature qualified "health centers" by the term "those." See 71 P.S. § 1403(c)(1) (providing that "the department shall operate **those** public State health centers and provide at a minimum those public health services in effect as of July 1, 1995). The term "those" preceding "public State health centers" must have an identifiable reference, which can only be "those public State health centers" . . . "in effect as of July 1, 1995."

Executive Branch's contention, this mandate to "operate those public State health centers . . . in effect as of July 1, 1995," is a specific duty independent of the separate prohibition of closing Centers due to privatization, which is contained in the second sentence of the provision. As SEIU cogently notes, if we were to adopt the Executive Branch's position that Section 1403(c)(1) prohibits only the closing of Centers due to privatization of health services, then the first sentence of the statute would be rendered meaningless in contravention of the canons of statutory construction. See 1 Pa.C.S. § 1921(a) (providing that "[e]very statute shall be construed, if possible, to give effect to all its provisions").

Notwithstanding that the portions of the statute implementing the privatization pilot program have expired, the General Assembly has never seen fit to eliminate the mandate that the DOH operate the same number of Centers and provide the same level of public health services that existed in July of 1995. This Court may not disregard the language of the statute when it is facially clear. See 1 Pa.C.S. § 1921(b). Moreover, under the Executive Branch's interpretation, the DOH could close all state health centers (if not due to privatization) as long as "equivalent" public health services are being provided. While the DOH could readily recommend this position to the General Assembly, it cannot implement it absent new legislation.

We conclude that by enacting Section 1403(c)(1), the General Assembly established the requisite number of Centers and the minimum level of public health services, and reserved to itself, not the Executive Branch, the ability to alter that system.[18]

---

[18] Contrary to the dissent, we do not interpret Section 1403(c)(1) as indicating a legislative intent "to lock the state into a series of locations in perpetuity," Dissenting Opinion at 3, or to "maintain the exact same building as a center, forever tying the taxpayers' support to a location that has become an albatross." Id. As noted in n.8 supra, SEIU does not contend that the sixty Centers must continue in the exact buildings where they were located in July of 1995, as it concedes readily that many of the premises (continued…)

While the Executive Branch contends that its proposed modernization plan is more cost-efficient and better serves the citizens of the Commonwealth, it is not for this Court to opine on that policy determination. Rather than acting to "handcuff the [DOH's] ability to innovate and find new ways to combat . . . public health threats," Brief for Appellees at 13-14, this Court's adoption of SEIU's position constitutes strict adherence to the mandate of the General Assembly as expressed in Section 1403(c)(1). The statute makes clear that if a radical restructuring of the provision of public health services is to occur in this Commonwealth, the General Assembly, and not the Executive Branch, must make the necessary determination. Accordingly, we conclude that the Commonwealth Court's interpretation of Section 1403(c)(1) is erroneous as a matter of law, thereby invalidating its holding that SEIU was unlikely to succeed on the merits of its underlying action.[19]

## II. Immediate and Irreparable Harm

Having concluded that SEIU has a clear right to relief and is likely to succeed on the merits, we next examine whether it demonstrated that "an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages." Summit Towne Center, Inc., 828 A.2d at 1001. This inquiry is facilitated by case law holding that where the offending conduct sought to be restrained through a

---

(…continued)
were leased from non-governmental entities over which the DOH would have no control. SEIU's position, which we adopt herein, is that Section 1403(c)(1) requires that the number of Centers, i.e., sixty, remain the same.

[19] Because we conclude that SEIU is likely to succeed on the merits of its underlying action based upon a statutory violation, we need not address SEIU's contention that it is also likely to succeed on the constitutional grounds raised. See Commonwealth v. Janssen Pharmaceutica, Inc., 8 A.3d 267, 271 (Pa. 2010) (holding that "it has long been the policy of this Court to avoid constitutional questions where a matter can be decided on alternative, non-constitutional grounds").

preliminary injunction violates a statutory mandate, irreparable injury will have been established. See Commonwealth v. Coward, 414 A.2d 91, 98-99 (Pa. 1980) (holding that where a statute prescribes certain activity, the court need only make a finding that the illegal activity occurred to conclude that there was irreparable injury for purposes of issuing a preliminary injunction); Pennsylvania Public Utility Commission v. Israel, 52 A. 2d 317, 321 (Pa. 1947) (holding that when the Legislature declares certain conduct to be unlawful, it is tantamount to calling it injurious to the public, and to continue such unlawful conduct constitutes irreparable injury for purposes of seeking injunctive relief); Commonwealth ex rel. Corbett v. Snyder, 977 A.2d 28 (Pa. Cmwlth. 2009) (affirming issuance of a preliminary injunction and finding that irreparable harm was presumed where there was a credible violation of the state consumer protection statute).

It is undisputed that the Executive Branch proposes to close more than one-third of the existing sixty Centers and to furlough twenty-six nurse consulting positions. Even absent factual findings by the Commonwealth Court regarding the pros and cons of the Executive Branch's proposal, it is clear that such action will reduce the number of Centers and the level of public health services in direct contravention of the plain language of Section 1403(c)(1). Accordingly, we conclude that SEIU has demonstrated immediate and irreparable harm.

### III. Greater Harm from Refusing Injunction

We must next examine whether SEIU has demonstrated that "greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings." Summit Towne Center, Inc., 828 A.2d at 1001. Similar to our discussion on the irreparable injury prong, we conclude that greater injury would result from refusing an injunction than granting it; moreover, we can discern no harm in maintaining the *status*

*quo* which has existed since at least 1995, in conformity with the clear legislative mandate. Any policy arguments that the modernization plan is more practical and cost-effective than the existing structure for delivering public health services should be addressed to the General Assembly, and are not for our Court to decide in this appeal from the denial of interim relief.

### IV. Restoration of *Status Quo*

Our inquiry next turns to whether SEIU has shown that "a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct." Id. Stated differently, "[t]he relevant standard requires that an injunction must address the *status quo* as it existed between the parties before the event that gave rise to the lawsuit, not to the situation as it existed after the alleged wrongful act but before entry of the injunction." Ambrogi v. Reber, 932 A.2d 969, 979 (Pa. Super. 2007). We conclude that SEIU satisfied this requisite because the grant of the requested injunctive relief will restore the parties to their status as it existed before the DOH attempted to close the twenty-six Centers and eliminate the twenty-six nurse consultant positions.

### V. Reasonably Suited to Abate Offending Activity

We must also determine whether the injunction SEIU seeks is "reasonably suited to abate the offending activity." Summit Towne Center, Inc., 828 A.2d at 1001. Our issuance of a preliminary injunction instructing the Commonwealth to cease reducing the number of Centers, reestablish Centers in counties in which they have been unlawfully closed, cease reducing the level of public health services, and restore the level of public health services to that which existed on July 1, 1995, is reasonably tailored to abate the Executive Branch's offending conduct.

### VI. Not Contrary to Public Interest

Finally, we must inquire whether SEIU has demonstrated that "a preliminary injunction will not adversely affect the public interest." Id. SEIU has satisfied this final requisite for injunctive relief. As noted, when the Legislature declares particular conduct to be unlawful, it is tantamount to categorizing it as injurious to the public. Pennsylvania Public Utility Commission v. Israel, 52 A.2d at 321. Furthermore, the maintenance of the *status quo* will protect, rather than harm the public, as it will assure that the minimum health care services mandated by the Legislature will continue to be available to the recipients of those services.

## VII. Conclusion

We conclude that SEIU satisfied the stringent criteria for the grant of a preliminary injunction, and can identify no reasonable ground for the denial of interim relief. Thus, the Commonwealth Court's denial of the request for injunctive relief is reversed and we issue a preliminary injunction, instructing the Executive Branch to cease reducing the number of Centers, reestablish Centers in counties in which they have been unlawfully closed, cease reducing the level of public health services, and restore the level of public health services to that which existed on July 1, 1995.

Former Justice McCaffery did not participate in the decision of this case.

Mr. Chief Justice Castille, Mr. Justice Saylor, Madame Justice Todd and Mr. Justice Stevens join the opinion.

Mr. Justice Eakin files a dissenting opinion.