**[J-73-2017] [MO: Saylor, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| THE MARCELLUS SHALE COALITION, | : | No. 115 MAP 2016 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 573 MD |
| | : | 2016 dated November 8, 2016 |
| v. | : | |
| | : | ARGUED: October 18, 2017 |
| | : | |
| DEPARTMENT OF ENVIRONMENTAL | : | |
| PROTECTION OF THE | : | |
| COMMONWEALTH OF PENNSYLVANIA | : | |
| AND ENVIRONMENTAL QUALITY | : | |
| BOARD OF THE COMMONWEALTH OF | : | |
| PENNSYLVANIA, | : | |
| | : | |
| Appellants | : | |

## CONCURRING AND DISSENTING OPINION

**JUSTICE DONOHUE**                                              **DECIDED: June 1, 2018**

I join in the Majority's decision to reverse the Commonwealth Court's decision to grant a preliminary injunction upon the request of the Marcellus Shale Coalition ("MSC") with respect to well-development impoundments, 25 Pa. Code § 78a.59b(b), and site restoration, 25 Pa. Code § 78a.65(a). I dissent from the Majority's decision to affirm the Commonwealth Court's entry of a preliminary injunction against the Pennsylvania Department of Environmental Protection ("DEP") and the Pennsylvania Environmental Quality Board (the "EQB") (collectively, the "Agencies"), with respect to the enforcement of newly enacted regulations[1] governing public resources, 25 Pa. Code §§ 78a.1,

---

[1] These regulations were promulgated after extensive rulemaking proceedings that included over 28,000 public comments, testimony from 429 witnesses, and twelve public hearings.

78a.15(f)-(g), areas of review, 25 Pa. Code § 78a.52(a), 78a.73(c)-(d), and centralized impoundments, 25 Pa. Code § 78a.59c. For these latter regulations, MSC did not offer any substantial evidence in the proceedings before the Commonwealth Court[2] and did not, in my view, meet its burden of proof to establish the six requirements for the issuance of a preliminary injunction.

To obtain a preliminary injunction, the requesting party must show:

(1) the injunction is necessary to prevent immediate and irreparable harm that cannot be compensated adequately by damages;

(2) greater injury would result from refusing the injunction than from granting it, and, concomitantly, the issuance of an injunction will not substantially harm other interested parties in the proceedings;

(3) the preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct;

(4) the party seeking injunctive relief has a clear right to relief and is likely to prevail on the merits;

(5) the injunction is reasonably suited to abate the offending activity; and,

(6) the preliminary injunction will not adversely affect the public interest.

---

[2] At the outset of those proceedings, MSC advised the Commonwealth Court that it would not be calling any witnesses and would instead rely upon admissions in the pleadings by the Agencies as "undisputed facts." N.T., 10/25/2016, at 4. MSC later admitted into evidence a limited number of documents, consisting of the transcript of an EQB hearing, a regulatory analysis form (the "RAF") submitted by the Agencies to the Independent Regulatory Review Commission, a copy of the 78a regulations, and two letters from General Assembly's House and Senate regulatory committees (admitted solely for the purpose of reflecting their participation in the regulatory review process). *Id.* at 14-18.

*SEIU Healthcare Pennsylvania v. Commonwealth*, 104 A.3d 495, 501 (Pa. 2014).

For a preliminary injunction to issue, all of these prerequisites must be established, and the burden of proof for all six items rests squarely with the party seeking the preliminary injunction. *Warehime v. Warehime*, 860 A.2d at 41, 47 (Pa. 2004) ("The burden is on the party who requested preliminary injunctive relief."); *County of Allegheny v. Commonwealth*, 544 A.2d 1305, 1307 (Pa. 1988); *Beaver Cty. ex rel. Beaver Cty. Bd. of Comm'rs v. David*, 83 A.3d 1111, 1117 (Pa. Commw. 2014). Despite its multitudinous burdens of proof, MSC, as the entity requesting that regulations designed and adopted to protect Pennsylvania's environmental resources be preliminarily enjoined from enforcement, did not call any witnesses to testify at the evidentiary hearing.[3] In contrast, although they had no burden of proof, the Agencies called DEP Deputy Secretary Scott Perry ("Secretary Perry"), the head of the agency's Office of Oil and Gas Development, who provided extensive testimony regarding the Agencies' rulemaking efforts with respect to the regulations at issue here.

**Public Resources (Count I)**

Section 3215(c) of the 2012 Oil and Gas Act, 58 Pa.C.S. §§ 2301–3504 (the "Act"), provides that DEP must, as part of the permitting process for an unconventional gas well, consider the proposed well's impacts on the following public resources.

> Impact.--On making a determination on a well permit, the department shall consider the impact of the proposed well on public resources, including, but not limited to:
>
> (1)    Publicly owned parks, forests, game lands and wildlife areas.
>
> (2)    National or State scenic rivers.

---

[3]   Contrary to the Majority's indication, I do not criticize MSC for failing to call any witnesses. Instead, I disagree with the Commonwealth Court's decision to grant preliminary injunctions with respect to certain of the section 78a regulations in instances where MSC did not introduce sufficient evidence of record to meet its burdens of proof.

> (3)  National natural landmarks.
>
> (4)  Habitats of rare and endangered flora and fauna and other critical communities.
>
> (5)  Historical and archaeological sites listed on the Federal or State list of historic places.
>
> (6)  Sources used for public drinking supplies in accordance with subsection (b).

58 Pa.C.S. § 3215(c). Sections 78a.15(f) and (g) of the regulations promulgated in connection with section 3215(c) require prospective drillers to make certain notifications in circumstances where drilling may impact a public resource, thus providing DEP with a methodology for considering these impacts so that DEP will know whether to grant the permit or otherwise add permit conditions to avoid potentially negative impacts from fracking activities.

Relevant to the preliminary injunction granted as to Count I, based upon public comments received during the rulemaking process, EQB added a requirement that DEP consider impacts when an unconventional well is proposed to be drilled within 200 feet of "common areas of a school's property or playgrounds." 25 Pa. Code § 78a.15(f)(1)(vi). In section 78a.1, "common areas of a school's property" is now defined as an "area on school property accessible to the general public for recreational purposes," and "playground" is defined as an "outdoor area provided to the general public for recreational purposes … includ[ing] community operated recreational facilities." 25 Pa. Code § 78a.1. In connection with the existing regulation in section 78a.15(f)(1)(iv), which requires consideration of impacts of drilling on "other critical communities" (per section 3215(c)(4)), section 78a.1 added a definition of "other critical communities" (a previously undefined term) to mean species of special concern identified through the Pennsylvania Natural Diversity Inventory ("PNDI"). 25 Pa. Code § 78a.1.

**The absence of a substantial legal question with respect to "common areas of a school's property or playgrounds"**

In my view, these new regulations and related definitions do not establish the sort of substantial legal question required for a preliminary injunction.[4]   Application of a straightforward rule of statutory construction demonstrates that the Agencies' interpretation of section 3215(c) – to include consideration of "common areas of a school's property or playgrounds" – is neither unreasonable nor in any respect erroneous.  As quoted above, in setting forth a list of the types of public resources that DEP should consider in the permitting process, section 3215(c) uses the phrase "including, but not limited to."   This phrase is widely recognized as a signal to apply the long accepted statutory construction doctrine of ejusdem generis ("of the same kind or class").  *Dep't of Envtl. Prot. v. Cumberland Coal Res.*, LP, 102 A.3d 962, 976 (Pa. 2014).  The doctrine of ejusdem generis provides that when general expressions (such as "including, but not limited to") precede a specific list of specific items, the general words are to be interpreted as words of enlargement and not limitation -- such that the list is to be construed to include not only the specifically enumerated items but also other items of the same general nature or class.  *Id*; *see also Com. ex rel. MacElree v. Legree,* 609 A.2d 155, 157 (Pa. 1992); *Pa. Human Rel. Comm. v. Alto–Reste Park Cemetery Ass'n*, 306 A.2d 881, 885 (Pa. 1973).

As such, in determining the ambit of section 3215(c), whether the Agencies improperly expanded the list of items to be considered pursuant to section 78a.15(f) by including "common areas of a school's property or playgrounds" depends upon whether this item is of the same kind or class as those specifically listed.   In this regard, the

---

[4]  I agree with the Majority's determination that only a substantial legal question needs to be raised to establish the fourth requirement for a preliminary injunction (clear right to relief).  Majority Op. at 19 (citing *SEIU*, 104 A.3d at 506; *Fischer v. Dept. of Public Welfare*, 439 A.2d 1172, 1174 (Pa. 1982)).

Agencies have offered an entirely reasonable response, namely that "common areas of a school's property or playgrounds" is of the same kind or class as publicly owned parks. Agencies' Brief at 35. The resources share common characteristics, as the general public utilizes them in precisely the same way (for recreation). As the Agencies further explain, the definitions of "common areas of a school's property" and "playground" make clear that the impact on these areas is to be considered only when the general public has open access to them for recreational purposes. *Id.*

Rather than apply a venerable rule of statutory construction to resolve this issue, the Commonwealth Court questioned whether consideration of "public resources" in section 3215(c) is limited to publicly-**owned** resources, rather than **privately**-owned resources. Commonwealth Court Opinion, 11/8/2016, at 16-18. In so doing, the Commonwealth Court speculated that section 3215(c) could be over-broadly construed to permit the inclusion of various other types of privately-owned resources open to the public, including shopping centers, movie theaters, sports stadiums and amusement parks. *Id.* at 17 n.11.[5]

---

[5] In a footnote, the Commonwealth Court suggested that it is "possible" that when enacting section 3215(c), the General Assembly intended to protect only those "public natural resources" expressly protected under Article I, Section 27 of the Pennsylvania Constitution. Commonwealth Court Opinion, 11/8/2016, 17 n.10. By highlighting the word "public" in Article I, Section 27's reference to "**public** natural resources," the Commonwealth Court implied that this provision of our Constitution includes a distinction of the type MSC insists exists in the present statutory analysis, namely between publicly-owned and privately-owned real property.

The Commonwealth Court's interpretation of Article I, Section 27 of our Constitution as limiting the obligation of the Commonwealth to protect only natural resources located on lands owned by governmental entities is both undeveloped and unsupported by any analysis or citation to authority. The constitutional text emphasizes that "Pennsylvania's public natural resources are the **common property of all the people**, including generations to come." Pa. Const. art I, § 27 (emphasis added). Without explanation, the Commonwealth Court equated "**public** natural resources" with real property owned by **governmental** entities. I note that the natural resource at issue here is not real property,

For several reasons, I do not think that the distinction between publicly-owned and privately-owned resources has any application in the present context and does not support the finding that a substantial legal question exists. First, the Agencies did not include shopping centers, movie theaters, etc. in section 78a.15(f), and thus the issue of whether these types of entities could properly be included in regulations promulgated pursuant to section 3215(c) is simply not before the Court. Second, no language in section 3215(c) suggests that public **ownership** of the resources at issue is a limiting factor in the DEP's consideration of the impacts on those resources that may result from unconventional well drilling.[6] To the contrary, of the six general types of public resources listed in section 3215(c), only "publicly owned parks" specifically refers to ownership,[7] and as indicated above, "publicly owned parks" appears immediately after the "including, but not limited to" words of enlargement. Whether publicly owned or privately owned but open to the public, the general public uses recreational areas and playgrounds in precisely the same way, and neither the Commonwealth Court nor MSC has provided

---

either publicly or privately owned, but rather environmentally healthy open space for recreation with access to all members of the public.

In any event, because the object of interpretation here is a statute and not Article I, Section 27 of our Constitution, and because neither this Court nor the Commonwealth Court had the benefit of detailed advocacy or constitutional analysis by the parties, further discussion of this issue is unnecessary.

[6] Section 3202 of the Oil and Gas Act sets forth a declaration of the purpose of its Chapter 32 ("Development"), in which section 3215(c) is located. This purpose includes the "optimal development of oil and gas resources of this Commonwealth consistent with protection of the health, safety, environment and **property of Pennsylvania citizens**." 58 Pa.C.S. § 3202(1) (emphasis added).

[7] The Agencies further observe that many of the public resources listed in section 3215(c) are located on privately-owned property, including national or state scenic rivers, places identified on federal or state lists of historic places, sources used for public drinking supplies, and habitats of rare and endangered flora and fauna. Agencies' Brief at 35-36.

any compelling argument as to why impacts on these resources should not be considered in equal measure before the DEP issues a permit to allow fracking activities in these areas (i.e., within 200 feet of recreational areas and playgrounds).[8]

### The absence of a substantial legal question with respect to "other critical communities"

Section 3215(c)(4) requires the DEP to consider impacts on "[h]abitats of rare and endangered flora and fauna and other critical communities" before issuing permits for unconventional well-drilling. Section 78a.1 now defines "other critical communities" to include "species of special concern identified on the PNDI index." 25 Pa. Code § 78a.1. The PNDI ("Pennsylvania Natural Diversity Inventory") index is a database that gathers Pennsylvania's ecological information, including species of plants and animals that have been classified as "species of special concern" by the state agencies with the statutory authority and obligation to protect them – including the Department of Conservation and Natural Resources, the Game Commission, the Fish and Boat Commission, and the Pennsylvania office of the Fish and Wildlife Service.

In its petition for preliminary injunctive relief, MSC alleged that the PNDI index is erratic, as its contents are "ever changing." Petition for Review Seeking Declaratory and Injunctive Relief, 10/13/2016, ¶ 44g. In its brief filed with this Court, MSC further contends that while the PNDI index has previously been used to identify threatened or endangered species, its use to identify species of special concern is new. MSC's Brief at 23. In the

---

[8] In his concurring opinion in *Robinson Twp. v. Commonwealth*, 83 A.3d 901 (Pa. 2013), Justice Baer offered an apt description of the "fracking" activities involved in the drilling of unconventional gas wells: "these industrial-like operations include blasting of rock and other material, noise from the running of diesel engines, sometimes nonstop for days, traffic from construction vehicles, tankers, and other heavy-duty machinery, the storage of hazardous materials, constant bright lighting at night, and the potential for life-and property-threatening explosions and gas well blowouts." *Id.* at 1005 (Baer, J., concurring).

proceedings before the Commonwealth Court, however, MSC offered no evidence to support these contentions. The Agencies, conversely, offered the testimony of Secretary Perry, who testified that the use of the PNDI database has been a long-standing practice of the DEP in its efforts to consider impacts on protected public resources, specifically to "require a minimal consultation process with agencies that are protecting resources that have been deemed appropriate for additional protection." N.T. 10/25/2016 at 158. According to Secretary Perry, the new definition did not impose any new requirements on drilling applicants, but merely provided "clarity and certainty that industry needs to operate efficiently." *Id.* at 161.

The Commonwealth Court found a substantial legal question based upon its conclusion that "species of special concern" is not a resource classification specifically referenced in section 3215(c)(4). Commonwealth Court Opinion, 11/8/2016, at 18. According to the Commonwealth Court, section 3215(c) references only threatened and endangered species. *Id.* at 17-18. As such, the Commonwealth Court reasoned that "species of special concern" have no protection "under the laws of this Commonwealth that DEP is entrusted to enforce," and the definition of "other critical communities" appears to be "untethered to [the Agencies'] regulatory authority." *Id.* at 18.

No substantial question exists here. The Commonwealth Court unreasonably, and in further violation of basic rules of statutory interpretation, equated the reference to "other critical communities" in section 3215(c)(4) with threatened and endangered species. Such a narrow interpretation of section 3215(4) treats the phrase "other critical communities" as mere surplusage, which is not permissible under basic statutory construction principles. *See, e.g., Reginelli v. Boggs*, 181 A.3d 293, 305 (Pa. 2018) (citing *Burke by Burke v. Independence Blue Cross*, 171 A.3d 252, 260 (Pa. 2017)); *see also* 1 Pa.C.S. § 1921(a) ("Every statute shall be construed, if possible, to give effect to all its

provisions."). The new definition of "other critical communities" identifies specific species of plants and animals that, while not threatened or endangered, must be considered during the permitting process. As Secretary Perry testified, the PNDI database merely provides DEP with a mechanism, long employed, to identify those species that Pennsylvania agencies with regulatory authority in this area categorize as worthy of special concern and protection. N.T., 10/25/2016, at 161. Contrary to the Commonwealth Court's contention that section 3215(c)(4) provides DEP with no statutory authority to consider these species of special concern during the well permitting process,[9] DEP clearly has the statutory authority to consider the impacts on "other critical communities," and section 3274 of the Act provides the EQB with the authority to promulgate regulations necessary to implement section 3215. 58 Pa.C.S. § 3274.

**The lack of evidence regarding adverse effects on the public interest**

With respect to the request for a preliminary injunction in Count I, MSC had the burden of proving that an injunction prohibiting the enforcement of section 78a.15(f) ("common areas of a school's property or playgrounds") and the definition of "other critical communities" in section 78a.1 would have no adverse effects on the public interest. The Commonwealth Court concluded that MSC had met this burden because the Agencies "did not provide any evidence during the hearing in this matter to prove that enjoining preliminarily the enforcement of these discrete provisions will harm any person, entity, or the public in general." Commonwealth Court Opinion, 11/8/2016, at 19 n.13. In its brief filed with this Court, MSC concurs, observing that the record here contains no evidence of "any public harm at all." MSC's Brief at 32. The Majority concluded that it has "no

---

[9] Pursuant to Article I, Section 27 of our Constitution, "species of special concern" are among the many public natural resources that are "the common property of all the people." Pa. Const. art. I, § 27. The Agencies' protective inclusion of species sensitive to environmental factors is precisely the stewardship that our Environmental Rights Amendment requires.

basis to disagree" that "issuing the preliminary injunction, narrowly tailored as appropriate, would not adversely affect the public interest." Majority Op. at 24.

This analysis unquestionably, and improperly, shifts the burden of proof on the sixth prong from MSC to the Agencies. It was MSC's burden of proof to establish that enjoining the challenged regulations would not adversely affect the public interest, and the Agencies had no obligation to introduce any evidence on this issue. Ironically, MSC's observation that the record does not contain any evidence of "any public harm at all" is likely true, although the reason for this state of affairs is that MSC, despite its burden of proof on the issue, introduced no such evidence into the record. The Majority offers no explanation as to how the **absence** of evidence that the public will not be adversely affected by an injunction on new environmental regulations somehow constitutes proof that the public will not, in fact, be adversely affected. By statute, the Agencies have an obligation to regulate unconventional well drilling to protect "the health, safety, environment and property of Pennsylvania citizens." 58 Pa.C.S. § 3202(1). As a result, here the "public interest" in the enforcement of these new environmental regulations, duly promulgated pursuant to the Agencies' rulemaking authority, is directly aligned with those of the Agencies. Enjoining enforcement of these regulations is, absent any contrary evidence from MSC, clearly not in the public interest, as during the pendency of the injunction DEP may not consider the impacts of fracking activities within 200 feet of recreational areas and playgrounds, and must ignore the impacts that fracking activities will have on species of special concern.

**Area of review (Count II)**

Sections 78a.52a(c)(3) and 78a.73(c) and (d) require drillers to identify and monitor existing oil and gas wells potentially impacted by ongoing fracking activities and, if appropriate, to plug those wells. 25 Pa. Code §§ 78a.52a(c)(3), 78a.73(c)-(d). The

Commonwealth Court found that a substantial legal question exists with regard to implementation of these regulations, namely, whether the Agencies may obligate a driller to monitor or plug wells that are on property that it does not own. Commonwealth Court Opinion, 11/8/2016, at 25. The Majority agrees that a substantial legal question exists with respect to DEP's authority to impose obligations on drillers to enter other persons' lands and visually monitor and/or cap wells. Majority Op. at 28.

I question whether a substantial legal question has been identified. The Clean Streams Law, 35 P.S. §§ 691.1 - 691.1001, provides that DEP has the power to authorize entry onto others' land to protect against pollution or the danger thereof. 35 P.S. § 691.316 ("Whenever the department finds that pollution or a danger of pollution is resulting from a condition which exists on land in the Commonwealth the department … may order such owner or occupier to allow a mine operator or other person or agency of the Commonwealth access to the land to take such action."). The Majority's attempt to distinguish this provision from the present regulation by stating that section 691.316 "is only triggered by actual pollution or a danger of pollution," Majority Op. at 28, ignores the Agencies' presentation of evidence in these proceedings. At the evidentiary hearing, Secretary Perry testified regarding the substantial evidence of the dangers of pollution associated with well communication[10] incidents. N.T. 10/25/2016 at 119-20 ("It's a multi-

---

[10] According to the RAF,

> The Department estimates that there are approximately 300,000 abandoned wells across Pennsylvania. A serious risk to waters of the Commonwealth is posed when an operator inadvertently alters an abandoned well by inducing hydraulic or pressure communication during the hydraulic fracturing process. Altering an abandoned well by subjecting it to pressures and reservoir sections it was not necessarily built to isolate can and has led to a number of issues, including methane migration and water supply impacts. Even in instances when no water supplies are

day geyser event with … fluids coming out of the out of the abandoned well onto the surface. And also when it's happened, we've seen significant gas migration problems where … [gas] is outside of the well bore getting into groundwater."). Conversely, the Commonwealth Court acknowledged that "MSC did not provide any testimony or other evidence relating to the difficulty that the industry would have in complying with these provisions." Commonwealth Court Opinion, 11/8/2016, at 26.

Moreover, as with respect to public resources, MSC failed to meet its burden of proof with respect to adverse effects to the public interest. The Commonwealth Court made no findings with regard to this prerequisite for a preliminary injunction, stating, in conclusory fashion, only that "[r]egulation will not adversely affect the public interest." *Id.* at 27. In attempting to support this bald contention, MSC references figures obtained from the RAF form, which reflect that number of significant incidents is low. MSC's Brief at 39-40. The Majority finds this argument to be persuasive, as it concludes that "the expected effect on the public interest would be slight due to the low probability of a well-communication incident occurring within the limited timeframe involved." Majority Op. at 31.

I find this position to be entirely unpersuasive. The second prong of the test for a preliminary injunction ("greater injury would result from refusing the injunction than from granting it") requires a balancing of interests. The sixth prong, however, does not. Instead, it requires the party requesting the preliminary injunction to meet its burden of proof to show that "the preliminary injunction will **not** adversely affect the public interest." *SEIU*, 104 A.3d at 501 (emphasis added). To meet this burden of proof, it is insufficient

---

affected, communication with any adjacent oil or gas well has the potential to lead to well control incidents that may pose serious safety hazards.

RAF at 19, reprinted at R.R. 774.

to offer evidence that the risk to the public is merely "slight," as it must instead be demonstrated that the entry of a preliminary injunction will have no effect on the public interest.

In connection with the regulation at issue, the public has an obvious interest in permitting the Agencies to enforce the regulations at issue. At the evidentiary hearing, Secretary Perry testified that while well-communication incidents "are not a common occurrence," they do occur and that when they do they "pose great risks to public safety as well as … potentially a multimillion dollar cleanup liability to remediate the well and remove the polluted soils and groundwater." N.T. 10/25/2016 at 120. This unrebutted testimony establishes that the lack of regulation during the pendency of this lawsuit does in fact expose the public to a non-zero probability of substantial risks to public safety as well as significant water pollution and high cleanup costs.[11] For this reason, no preliminary injunction should have issued.

**Impoundments (Count IV)**

Section 78a.59c is a new regulation that governs centralized impoundments, which are storage facilities that hold waste water generated from drilling activities. Section 78a.59c mandates that all centralized impoundments must be closed or re-permitted by October 8, 2019 in accordance with regulations promulgated pursuant to the Solid Waste Management Act, 35 P.S. §§ 6018.101-6018.1003 ("SWMA"). At the evidentiary hearing,

---

[11] Contrary to the Majority's contention that the public interest need not be considered here because the risk of a well communication incident is "remote and speculative," in my view five prior documented incidents constitutes a substantial risk of potential harm to the public. This is particularly true since, as Secretary Perry testified, a single incident during the pendency of this case could result in a significant risk to public safety as well as substantial water pollution and high cleanup costs. *See Samaritan v. First Judicial Dist. Court*, 303 Ph.D. 959, 965 (9th Cir. 2002) ("If … the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction.".

Secretary Perry testified that although the Agencies had previously taken the position that DEP could not regulate centralized impoundments pursuant to SWMA, in light of the significant evidence of leakage from such facilities uncovered during the rulemaking proceedings, they had reconsidered their position with respect to their regulatory authority under SWMA. N.T., 10/25/2016, at 134-35. Based upon this testimony, the Majority concludes that MSC has identified a substantial legal question, namely how centralized impoundments "are **not** part of the associated well site for SWMA purposes, whereas they *were* part of the well site before it was known that they could leak." Majority Op. at 36 (emphasis in original).

Even assuming that this constitutes a substantial legal question, the Majority's analysis with respect to the adverse effects from enjoining enforcement of the new regulation on the public interest fails. According to the Majority, the Commonwealth Court's preliminary injunction is limited to existing centralized impoundments and that, as such, "granting interim relief would not adversely affect the public interest." *Id.* at 37. The certified record, however, belies this determination, as Secretary Perry testified at the evidentiary hearing that of the twenty-two centralized impoundment facilities then in existence in the Commonwealth, six have had their liners fail, resulting in leaking and groundwater contamination. N.T., 10/25/2016, at 134-35 ("There's only about 22 of them in the Commonwealth, and I think over time we've identified half a dozen that have failed, some of them more spectacularly than others."). Based on this testimony, the public interest is affected by an injunction, as there is a high probably of additional leaks of waste water into groundwater supplies. MSC offered no evidence at the hearing to rebut Secretary Perry's testimony, and thus failed to sustain its burden of proof with respect to the sixth prerequisite for a preliminary injunction.

**Conclusion**

For these reasons, I would reverse the Commonwealth Court's entry of a preliminary injunction on all counts. In this regard, I join in the Majority's decision to reverse with respect to Count IV (re: well-developed impoundments) and Count V (site restoration). I dissent from the Majority's decision to affirm the entry of a preliminary injunction with respect to Count I (public resources), Count II (area of review) and Count IV (re: centralized impoundments).