**[J-73-2017]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| THE MARCELLUS SHALE COALITION, | : | No. 115 MAP 2016 |
| | : | |
| | : | Appeal from the Order of the |
| Appellee | : | Commonwealth Court at No. 573 MD |
| | : | 2016 dated 11/8/16 |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF ENVIRONMENTAL | : | |
| PROTECTION OF THE | : | |
| COMMONWEALTH OF PENNSYLVANIA | : | |
| AND ENVIRONMENTAL QUALITY | : | |
| BOARD OF THE COMMONWEALTH OF | : | |
| PENNSYLVANIA, | : | |
| | : | |
| Appellants | : | ARGUED:  October 18, 2017 |

**OPINION**

**CHIEF JUSTICE SAYLOR**                    **DECIDED: June 1, 2018**

This is a direct appeal in the context of pre-enforcement judicial review of regulations governing the operation of unconventional gas wells in Pennsylvania.  The Commonwealth Court, sitting as a trial court, issued a single-judge opinion and order preliminarily enjoining the enforcement of some of the challenged regulations.  The administrative-agency parties appeal from that decision.

**I. Background**

On October 13, 2016, Appellee, the Marcellus Shale Coalition ("MSC"), filed in the Commonwealth Court's original jurisdiction a petition for review in the nature of a

complaint seeking declaratory and injunctive relief (the "Petition"), on behalf of itself and its members. MSC describes itself as a non-profit membership organization whose members explore, produce, transmit, and distribute natural gas from the Marcellus and Utica Shale formations. *See* Petition ¶¶3-4. MSC named as respondents the Pennsylvania Department of Environmental Protection ("DEP") and the Pennsylvania Environmental Quality Board (the "EQB") (collectively, the "Agencies").[1]

In the Petition, MSC challenged the validity of several regulations relating to unconventional gas well operations as governed by Pennsylvania's Oil and Gas Act of 2012, known as Act 13.[2] *See Robinson Twp. v. Commonwealth*, 623 Pa. 564, 584 & n.1, 83 A.3d 901, 913 & n.1 (2013). Those provisions are contained in Title 25, Chapter 78a of the Pennsylvania Administrative Code. They were promulgated as part of a rulemaking package which included regulations for conventional wells under Chapter 78 and for unconventional wells under Chapter 78a.[3] The package went into effect upon its publication in the Pennsylvania Bulletin on October 8, 2016.

---

[1] The Commonwealth Court noted that Pennsylvania's environmental administration is divided among three entities: DEP, which enforces environmental laws and regulations; the EQB, which is a rulemaking body; and the Environmental Hearing Board, an adjudicative entity tasked with resolving disputed matters. *See MSC v. DEP & EQB*, No. 573 M.D. 2016, *slip op.* at 3 n.2 (Pa. Cmwlth. Nov. 8, 2016) (citing *Tire Jockey Serv., Inc. v. DEP*, 591 Pa. 73, 106, 915 A.2d 1165, 1185 (2007)).

[2] Act of Feb. 14, 2012, P.L. 87, No. 13 (as amended 58 Pa.C.S. §§2301-3504). Under Act 13, an unconventional gas well is defined as a bore hole drilled so as to obtain natural gas from an "unconventional formation," 58 Pa.C.S. §2301, which in turn signifies a "geological shale formation existing below the base of the Elk Sandstone or its geologic equivalent stratigraphic interval where natural gas generally cannot be produced at economic flow rates or in economic volumes except by vertical or horizontal well bores stimulated by hydraulic fracture treatments or by using multilateral well bores or other techniques to expose more of the formation to the well bore." *Id.*

[3] In compliance with legislation enacted in 2014, regulations relating to unconventional gas wells were segregated from those pertaining to conventional gas wells, which are (continued…)

MSC asserted seven counts, focusing on regulations pertaining to discrete areas within Chapter 78a which were part of the new package. These included: public resources, *see* 25 Pa. Code §§78a.1, 78a.15(f), (g); area of review, *see id.* §§78a.52a, 78a.73(c), (d); onsite processing, *see id.* §78a.58(f); impoundments, *see id.* §§78a.59b, 78a.59c; site restoration, *see id.* §78a.65; remediation of spills, *see id.* §78a.66(c); and waste reporting, *see id.* §78a.121(b). MSC alleged that these provisions were void and unenforceable for multiple reasons, including that they were vague, lacked statutory authorization, and conflicted with other regulations and statutes applicable to the industry. *See* Petition ¶34. As well, MSC averred that the rulemaking process did not comply with the Regulatory Review Act, and that the EQB failed to develop criteria for DEP to use in conditioning a drilling permit on relevant factors. *See id.*

## A. Request for preliminary injunctive relief

Contemporaneous with the Petition, MSC filed an Application for Expedited Special Relief (the "Application"), requesting a preliminary injunction with respect to the Chapter 78a regulations challenged in the Petition pending a ruling as to their validity. The Agencies submitted a joint answer opposing the Application and arguing MSC failed to meet the requirements for a preliminary injunction. An evidentiary hearing was held with MSC bearing the burden to demonstrate the need for interim relief.[4]

---

(…continued)
governed under Chapter 78. Thus, Chapter 78a is a new chapter which pertains specifically to unconventional gas wells.

[4] To obtain a preliminary injunction, a litigant must show: (1) it is needed to prevent irreparable harm that cannot be adequately compensated by damages; (2) greater injury would result from refusing the injunction than from granting it, and, concomitantly, an injunction will not substantially harm other interested parties in the proceedings; (3) the injunction will restore the parties to their status as it existed prior to the alleged wrongful conduct; (4) the party seeking injunctive relief has a clear right to relief and is (continued…)

At the hearing, MSC did not present any witnesses, but it did enter documents into the record, including the transcript of an EQB meeting, a copy of Chapter 78a regulations, a regulatory analysis form submitted to the Independent Regulatory Review Commission ("IRRC") for consideration with those regulations, and correspondence from the House and Senate Environmental Resources and Energy Committees to the IRRC and EQB suggesting legislative disapproval of the proposed Chapter 78a regulations. For their part, the Agencies presented the testimony of DEP Deputy Secretary Scott Perry, who heads the agency's Office of Oil and Gas Management. Secretary Perry supplied information concerning unconventional gas drilling and how it differs from conventional drilling. He also addressed the substance of the disputed regulations, the process by which they were finalized, and the need for such rules.

## B. Trial court decision granting relief in part

The Commonwealth Court, per Judge Brobson, issued a single-judge, unpublished opinion and order, granting in part and denying in part preliminary injunctive relief. As MSC has not cross-appealed, we are only concerned with the portion of the decision granting such relief. In particular, the court granted the

---

(…continued)
likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and, (6) the injunction will not adversely affect the public interest. *See SEIU Healthcare Pa. v. Commonwealth*, 628 Pa. 573, 584, 104 A.3d 495, 502 (2014) (citing *Warehime v. Warehime*, 580 Pa. 201, 209-10, 860 A.2d 41, 46-47 (2004)).

In light of the applicant's burden of proof on these elements, Justice Donohue criticizes MSC for not calling its own witnesses. *See* Concurring and Dissenting Opinion, *slip op.* at 3. However, MSC introduced into the record various items of documentary evidence, and it subjected Secretary Perry to extensive cross-examination. The Commonwealth Court could properly consider all such evidence – as well as the Secretary's direct-examination testimony where appropriate – in assessing whether the factors enumerated above were satisfied.

Application for interim relief (at least in part) with respect to Counts I, II, IV, and V of Petition, and denied the Application in all other respects.

*General precepts*

Initially, the court made several general comments concerning the prerequisites for preliminary injunctive relief. The court explained, for example, that where a party incurs losses from having to comply with an invalid regulation and the relevant government agency is immune from liability, the party's losses constitute irreparable harm. *See MSC*, No. 573 M.D. 2016, *slip op.* at 8 (citing *Boykins v. City of Reading*, 128 Pa. Cmwlth. 154, 158, 562 A.2d 1027, 1028-29 (1989)). With respect to the clear-right-to-relief/likelihood-of-success element, the court added that it need not finally decide the merits of the challenger's substantive claims; rather, the court explained, the inquiry is whether the challenger has presented a substantial legal question that must be resolved to determine the parties' rights and obligations. *See id.* (citing *T.W. Phillips Gas & Oil Co. v. Peoples Natural Gas Co.*, 492 A.2d 776, 780-81 (Pa. Cmwlth. 1985)). Finally, the court indicated that the status quo to be preserved by a preliminary injunction is the last "peaceable, lawful, noncontested status which preceded the pending controversy." *Id.* (citing *The Woods at Wayne Homeowners Ass'n v. Gambone Bros. Constr. Co.*, 893 A.2d 196, 204 n.10 (Pa. Cmwlth. 2006)).

*Public resources (Count I)*

In Count I, MSC alleged that regulations pertaining to public resources, as reflected in Sections 78a.15(f) and (g), together with related definitions in Section 78a.1, were void and unenforceable for a variety of reasons.

The court noted that Section 78a.15(f) imposes on drilling applicants a pre-application-notice obligation relative to "public resources" – a term that is not defined but, in context, appears to signify various types of features such as forests, game lands,

wildlife areas, national natural landmarks, state or national scenic rivers, historical and archaeological sites, threatened or endangered species, and critical habitats. *See* 25 Pa. Code §78a.15(f)(1). Under the Chapter 78a regulations, it also includes "common areas on a school's property or a playground" and "other critical communities." *Id.* "Other critical communities" is defined in Section 78a.1 to include plant and animal "species of special concern identified on a [Pennsylvania Natural Diversity Inventory] receipt[.]" *Id.* §78a.1. Further, a "common area on a school's property" comprises "an area on a school's property accessible to the general public for recreational purposes." *Id.* Thus, the court observed, in relation to each public resource that may potentially be impacted by a proposed drilling operation, the applicant must provide to each "public resource agency" – that is, an entity which manages a public resource, including playground owners, *see id.* – information concerning its proposal, such as a plat and any measures which might mitigate prospective harm to the public resource in question.

MSC forwarded eleven distinct legal challenges to this scheme, *see* Petition ¶44, based largely on the premise that, in *Robinson Township v. Commonwealth*, 637 Pa. 239, 147 A.3d 536 (2016) ("Robinson Twp. IV"), this Court enjoined enforcement of Section 3215(c) of Act 13 – with the consequence that DEP lacked authority to protect "public resources" under Act 13. In the alternative, MSC claimed, *inter alia*, that: Act 13 does not authorize the type of pre-permitting notification scheme required by the above-mentioned regulations; such regulations exceed the scope of DEP's authority by extending public-resource status to species of special concern, common areas of schools, and playgrounds; the regulations improperly confer "public resource agency" status upon local government agencies and private parties; and the scheme does not comply with Section 3325(e) of Act 13. As to this latter contention, the court explained that Section 3215(e) directs the EQB to develop, by regulation, criteria for DEP to use in

"conditioning a well permit based on its impact to the *public resources* identified under subsection (c) and for ensuring optimal development of oil and gas resources and respecting property rights of oil and gas owners." 58 Pa.C.S. §3215(e)(1) (emphasis added). In turn, subsection (c) indicates that DEP "shall consider the impact of the proposed well on *public resources*" such as parks, forests, wildlife areas, scenic rivers, natural landmarks, habitats of "rare and endangered flora and fauna and other critical communities," historical and archaeological sites, and sources of "drinking supplies[.]" *Id.* §3215(c) (emphasis added).

The Commonwealth Court ultimately rejected MSC's general argument that DEP lacks authority to protect public resources under Act 13. The court explained that, in *Pennsylvania Independent Oil & Gas Ass'n v. DEP*, 146 A.3d 820 (Pa. Cmwlth. 2016), *aff'd per curiam*, ___ Pa. ___, 161 A.3d 949 (2017), it had concluded that, in the wake of *Robinson Township v. Commonwealth*, 623 Pa. 564, 83 A.3d 901 (2013) ("Robinson Twp. I"), DEP's authority under Section 3215(c) of Act 13 "to consider the impact that a proposed well will have on public resources, those listed and unlisted, is extant, limited only by" the portion of *Robinson Twp. I* that enjoins Act 13's enforcement with respect to certain statutory water source setback and waiver provisions. *MSC*, No. 573 M.D. 2016, *slip op.* at 14 (quoting *Pa. Indep. Oil & Gas Ass'n*, 146 A.3d at 829). The court also found most of the other legal theories forwarded by MSC to be insufficient to warrant preliminary injunctive relief.

The court did, however, conclude that MSC had raised a colorable argument that the regulations improperly expanded the list of protected resources beyond those enumerated in Section 3215(c). Although acknowledging that Section 3215(c)'s list is not exhaustive, the court observed that a substantial question remained whether the General Assembly intended to protect only publicly-owned natural resources, or all

publicly-owned property, as well as privately-owned property open to the public. *See id.* at 16-17.

Similarly, the Commonwealth Court found that MSC presented a substantial question regarding the permissibility of subsuming "species of special concern" within the public-resource protection rules by including them within the definition of "other critical communities." 25 Pa. Code §78a.1. It expressed that such resource classification fell below endangered or threatened species, was not the result of public rulemaking, and lacked special protection under Pennsylvania statutes enforced by DEP. Accordingly, the court indicated that the inclusion of "species of special concern" within the challenged regulations was "untethered" to the Agencies' authority under Act 13. *MSC*, No. 573 M.D. 2016, *slip op.* at 18.

Overall, then, the court determined that MSC had satisfied the clear-right-to-relief prong in relation to the Chapter 78a regulations in question insofar as they include as public resources "common areas on a school's property or a playground" and "species of special concern," and include playground owners as public resource agencies. The court reasoned that these aspects of the regulations gave rise to irreparable harm *per se* and, additionally, irreparable harm via the "cost [of] compliance with these provisions – costs that well applicants will be unable to recover . . . if this Court should rule in favor of MSC on the merits." *Id.*

Finally, the court held that the harm to MSC from refusing a narrowly-tailored preliminary injunction relative to the above discrete items outweighed the harm from granting it, particularly as granting it would leave in place the overall notice, comment, and mitigation scheme reflected in Section 78a.15(f), and the Agencies had not offered evidence at the hearing that preliminarily enjoining these provisions would harm any person, entity, or the public. As well, the court noted that a narrowly-tailored injunction

would restore the parties to the status quo as it existed prior to the alleged wrongful conduct and would not adversely affect the public interest. *See id.* at 19 & n.13.

*Area of review (Count II)*

In Count II of the Petition, MSC challenged the validity of regulations appearing in Sections 78a.52a and 78a.73(c) and (d), which relate to the obligations of well operators relative to nearby wells and the operators of such wells. These rules are designed to address DEP's concern with the unintentional migration of fluids and other materials associated with unconventional drilling from the target well to nearby orphan, abandoned, or plugged wells.

Under the regulations, prospective operators must, in the pre-drilling timeframe, conduct an area-of-review survey identifying all active, inactive, orphan, abandoned, and plugged-and-abandoned wells that lie within 1,000 feet of the operator's intended vertical well bore or of any point on the surface above the length of an intended horizontal bore.[5] They must also provide notice of their planned drilling activities to the operators of all such nearby wells. They are additionally required to engage in ongoing visual monitoring of all such nearby wells during well stimulation activities, and to provide remediation – such as plugging orphan and abandoned wells – in the event stimulation of a well by hydraulic fracturing causes an intrusion into or alteration of a well listed in the area-of-review survey. *See* 25 Pa. Code §§78a.52a, 78a.73(c), (d).

---

[5] Act 13 defines an abandoned well as one that has not been used for extraction within the past 12 months, or for which production equipment has been removed, or which is considered dry and not equipped for production within 60 days after drilling or deepening. *See* 58 Pa.C.S. §3203. It defines an orphan well as one that was abandoned before April 18, 1985, which "has not been affected or operated by the present owner or operator and from which the present owner, operator or lessee has received no economic benefit other than as a landowner or recipient of a royalty interest from the well." *Id.*

MSC alleged that: these provisions impose an unreasonable and unwarranted monitoring obligation; there is no legal authority for such area-of-review requirements; requiring someone other than the well owner to plug an orphan or abandoned well conflicts with Section 3220 of Act 13, which imposes plugging requirements only on the well owner or operator, *see* 58 Pa.C.S. §3220; the regulations are void for vagueness in light of DEP's admission at an EQB meeting that it intends to issue technical guidance documents to clarify the obligations created under them; and the monitoring and remediation provisions would force well operators to enter illegally onto property owned and controlled by others.

As with Count I, the Commonwealth Court granted preliminary injunctive relief in part. Initially, the court rejected the contention that the challenged regulations were unreasonable or unfounded, as MSC failed to demonstrate that the migration of drilling fluids poses no risk to Commonwealth waters as broadly defined by the Clean Streams Law.[6] *See* 35 P.S. §691.1 (relating to definitions). Further, the court indicated that in passing Act 13, the General Assembly envisioned that DEP's authority to regulate well operations in the public interest extended beyond Act 13 and "encompassed authority granted under a plethora of existing environmental laws, working in concert with Act 13." *MSC*, No. 573 M.D. 2016, *slip op.* at 24 (footnote and citations omitted). In light of such presumed authority, the court also determined that no substantial issue was raised concerning the appropriateness of requiring operators to submit to DEP an area-of-review survey as part of the application process. The court additionally rejected several other theories forwarded by MSC, including that the regulations are void for vagueness.

Nevertheless, the Commonwealth Court found that MSC raised a substantial legal issue regarding the reasonableness of the monitoring and remediation provisions.

---

[6] Act of June 22, 1937, P.L. 1987, No. 394 (as amended 35 P.S. §§691.1-691.1001).

It referenced significant implementation issues apparent from the face of the regulation, *i.e.*, 25 Pa. Code §78a.52a(c)(3), including whether a well operator could validly obtain access to, and remediate, every well listed in the area-of-review survey owned by others. Moreover, the court concluded that substantial questions existed as to how Section 78a.73(d) is consistent with the well-plugging requirements set forth in Act 13, which place the onus on a well owner or operator to plug its own wells, and DEP's own authority to plug wells under that statute. *See MSC*, No. 573 M.D. 2016, *slip op.* at 26 (citing, 58 Pa.C.S. §§3220, 3271).

The Commonwealth Court also determined that MSC established irreparable harm that outweighed any harm in refusing to grant the injunction, because the cost of compliance as estimated by the EQB was $11 million, which may be unrecoverable if MSC is successful on the merits. Further, the court concluded that an injunction would restore the parties to the status quo, that is, the absence of monitoring and remediation requirements with respect to wells owned or operated by others. Ultimately, the court expressed that it would grant a narrow preliminary injunction whereby operators must still monitor and remediate any of their own wells listed in the area-of-review survey, but not the wells of others. *See id.* at 27.

*Impoundments (Count IV)*

In Count IV, MSC alleged that the Chapter 78a rulemaking package contained regulations with extensive and burdensome new requirements for impoundments. MSC pointed to rules setting forth new construction standards for well-development impoundments, including requirements that they be constructed with a synthetic impervious liner and either have a completely-surrounding fence or be continuously monitored by an individual to prevent damage from third parties or wildlife. *See* 25 Pa.

Code §78a.59b(d), (e).[7] MSC also noted that existing well-development impoundments must be upgraded to meet these new standards or closed by October 10, 2017. *See id.* §78a.59b(b). As well, MSC averred that the regulations mandate that centralized impoundments either be closed or re-permitted by a date certain under the Solid Waste Management Act ("SWMA").[8] *See id.* §78a.59c.

MSC challenged these regulations on a number of grounds. Among these was a contention that operators, including its members with impoundments that were built in compliance with DEP regulations, must now close their impoundments or upgrade them to meet the new standards. In this respect, MSC observed there is no grandfathering for synthetic liners already in place. *See* Petition ¶64.

The Commonwealth Court found that a substantial legal question existed in this regard, noting in particular that Secretary Perry credibly testified that: the new rules arose, not from a change in the law, but from a change in DEP's interpretation of longstanding law; and existing impoundments permitted and built to DEP standards would have to be retrofitted or closed under DEP's new interpretation. *See MSC*, No. 573 M.D. 2016, *slip op.* at 32 (quoting *Young J. Lee, Inc. v. Dep't of Revenue*, 504 Pa. 367, 375, 474 A.2d 266, 270 (1983) ("The government cannot, on the one hand, create a business which is dependent on a permit and then, with the other, destroy it by revoking the authorizing permits without first affording sufficient due process." (internal quotation marks and citation omitted))). The court additionally recognized that,

---

[7] According to the Commonwealth Court, well-development impoundments store fresh water for use in drilling operations, whereas centralized impoundments store waste water generated from drilling activities. *See MSC*, No. 573 M.D. 2016, *slip op.* at 31.

[8] Act of July 7, 1980, P.L. 380 (as amended 35 P.S. §§6018.101-6018.1003).

according to the hearing evidence, the cost of impoundment retrofitting was substantial and potentially unrecoverable, thereby establishing irreparable harm.

Finally, while acknowledging that the proposed regulations would likely offer greater health and safety protections, the court noted DEP offered no evidence demonstrating that existing impoundments pose an immediate threat to the public health and safety or to the environment – a circumstance which led the court to conclude that the harm from refusing an injunction would outweigh any harm from granting it.

The Commonwealth Court expressed that its preliminary injunction as to the impoundment regulations would be closely fitted to address only the effect that such regulations would have on existing impoundments. Thus, the court denied injunctive relief insofar as the regulations apply to new impoundments. The court indicated that, as thus narrowed, the injunctive relief would not adversely affect the public interest. *See MSC*, No. 573 M.D. 2016, *slip op.* at 33.

*Site restoration (Count V)*

In Count V of its Petition, MSC challenged the regulations pertaining to site restoration. As the term suggests, site restoration refers to restoration, after the construction of a well is complete, of land surface areas disturbed during the creation of the well. *See* 25 Pa. Code §78a.65(a).

Site restoration is addressed by Section 3216 of Act 13. *See* 58 Pa.C.S. §3216(a) (requiring every well owner or operator to "restore the land surface within the area disturbed in siting, drilling, completing and producing the well"). That provision indicates operators must formulate an erosion and sediment control plan which complies with the Clean Streams Law. *See id.* §3216(b). It also requires that various aspects of site restoration be complete within nine months after a well is drilled, *see id.*

§3216(c), (d), unless an extension is obtained from DEP, *see id.* §3216(g). Finally, restoration activities accomplished per Act 13 and its associated regulations must comply with the Clean Streams Law. *See id.* §3216(e). The Commonwealth Court observed that Section 78a.65 appears to implement the requirements contained in Section 3216 of Act 13.

As with previous counts, MSC articulated several grounds on which it believed that Section 78a.65 was void and unenforceable. Ultimately, the Commonwealth Court found that only one of MSC's claims raised a substantial legal question.

By way of further background, under the Clean Streams Law and associated regulations in Title 25, Chapter 102 of the Pennsylvania Code (relating to erosion and sediment control), directives are given in a rule governing post-construction stormwater management ("PCSM"), namely 25 Pa. Code §102.8. Per that provision, all PCSM plans must meet certain basic requirements. *See id.* §102.8(f). Additional mandates for pre- and post-development stormwater analysis are listed in Section 102.8(g). Notably, subsection (g) exempts from its scope "regulated activities that require site restoration or reclamation, and small earth disturbance activities identified in subsection (n)[.]" *Id.* §102.8(g). Subsection (n), in turn, provides a list of exempted items which includes that portion of a site restoration plan identifying PCSM best management practices ("BMPs") to manage stormwater from oil and gas activities, and indicates that such items may be used to satisfy the requirements of Section 102.8, so long as the PCSM plan meets the requirements of several other enumerated subsections of Section 102.8 other than subsection (g). The subsection states, in full:

> (n) *Regulated activities that require site restoration or reclamation, and small earth disturbance activities.* The portion of a site reclamation or restoration plan that identifies PCSM BMPs to manage stormwater from oil and gas activities or mining activities permitted in accordance with Chapters 78 and 86--90; timber harvesting activities; pipelines; other

similar utility infrastructure; Department permitted activities involving less than 1 acre of earth disturbance; or abandoned mine land reclamation activities, that require compliance with this chapter, may be used to satisfy the requirements of this section if the PCSM, reclamation or restoration plan meets the requirements of subsections (b), (c), (e), (f), (h), (i) and (l) and, when applicable, subsection (m).

25 Pa. Code §102.8(n).

Returning to the Chapter 78a regulations in issue, MSC questioned whether Section 78a.65(d) could be enforced, given MSC's view that that subsection purported to limit the above-mentioned exemption. In particular, Section 78a.65(d) states:

(d) *Areas not restored.* Disturbed areas associated with well sites that are not included in a restoration plan, and other remaining impervious surfaces, must comply with all requirements in Chapter 102 (relating to erosion and sediment control). *The PCSM plan provisions in §102.8(n) apply only to the portions of the restoration plan that provide for restoration of disturbed areas to meadow in good condition or better or otherwise incorporate ABACT [antidegeneration best available combination of technologies] or nondischarge PCSM BMPs.*

25 Pa. Code §78a.65(d) (emphasis added).

The Commonwealth Court found that MSC had raised a substantial legal issue as to whether the above subsection "imposes erosion and sediment control measure requirements on well owners and operators in excess of what is required under the Clean Streams Law." *MSC*, No. 573 M.D. 2016, *slip op.* at 38. The court continued that Section 3216(b) and (c) of Act 13 specify that erosion and sediment control measures are to be implemented pursuant to the Clean Streams Law. It observed that in the regulatory analysis form (the "RAF") submitted to the IRRC for consideration with the Chapter 78a regulations, DEP had described these provisions as mere clarifications of existing law. The court noted that that position was undermined to the extent Section 78a.65(d) purports to abrogate any exemptions contained in the Clean Streams Law.

That being the case, the court determined that MSC had raised a substantial legal question and thus had satisfied the clear-right-to-relief prong. *See id.*

Further, the Commonwealth Court held that any conflict between Section 78a.65(d) and the Clean Streams Law and/or Chapter 102 constitutes irreparable harm *per se* insofar as the challenged provision conflicts with legislative intent as expressly stated in Section 3216(b) and (e) of Act 13. The court added that the harm to MSC from denying interim relief would outweigh any purported harm to the Agencies from granting it. On this latter point, the court expressed that preliminarily enjoining DEP from implementing the regulation should have no effect on the agency as DEP stated in the RAF that the regulation merely restates what the DEP believes are current restoration requirements. *See id.* at 37 (quoting RAF at 101). Additionally, the court indicated that enjoining the provision will restore the parties to the status quo before the allegedly wrongful conduct, namely, the absence of Section 78a.65(b). *See id.* at 39. Lastly, the Commonwealth Court clarified that its injunction would be narrowly tailored to encompass only Section 78a.65(d), thus "leaving intact the bulk of Section 78a.65 pending the outcome of this litigation." *Id.*

### *The Commonwealth Court's order*

Based on the foregoing, the Commonwealth Court issued an order granting in part and denying in part MSC's Application for Expedited Special Relief. The order preliminarily enjoined DEP from implementing and enforcing: (1) Sections 78a.1 and 78a.15(f) and (g) to the extent they include "common areas on a school's property or a playground" and "species of special concern" as "public resources" and include "playground owners" as a "public resource agency"; (2) Section 78a.52a(c)(3) and Section 78a.73(c) and (d) to the degree they impose monitoring and remediation obligations on owners and operators with respect to wells in the area-of-review survey

owned and/or operated by others; (3) Section 78a.59b(b) as to pre-existing impoundments (but not as to new impoundments) and 78a.59c, which by its terms only applies to operators using a centralized impoundment as of October 8, 2016; and (4) Section 78a.65(d) in its entirety. The order denied the Application in all other respects. *See MSC*, No. 573 M.D. 2016, *Order*, at 1-2 (Pa. Cmwlth. Nov. 8, 2016).

### C. Appeal to this Court

Litigation of the Petition's merits continues in the Commonwealth Court. In parallel with those proceedings, the Agencies appealed from the partial grant of preliminary injunctive relief, and this Court noted probable jurisdiction.

### II. Arguments and Analysis

### A. Trial court standard for interim relief

The Agencies generally contend that the Commonwealth Court did not utilize the correct standard for granting a preliminary injunction. They note that, when finally adjudicating the validity of a regulation adopted per an agency's rule-making power, courts use a three-part test whereby the regulation must be: (a) adopted within the agency's statutory power; (b) issued pursuant to proper procedure; and (c) reasonable. *See* Brief for Appellants at 27 (quoting *Tire Jockey Serv., Inc. v. DEP*, 591 Pa. 73, 108, 915 A.2d 1165, 1188 (2007)). Although the Commonwealth Court's reasoning centered on the first element, the Agencies initially focus on the third prong, arguing that a regulation can only be deemed unreasonable if it was fashioned in bad faith, is arbitrary, or represents a gross abuse of discretion. *See id.* at 28. The Agencies continue by asserting, without reference to supporting authority, that courts should apply the same level of deference to an agency's interpretation of its enabling statutes in reviewing a

pre-enforcement preliminary injunction as would be warranted in the context of a post-enforcement challenge. *See id.* at 29.

Based on these dual premises, the Agencies conclude (again without citation to authority) that, in assessing the clear-right-to-relief prerequisite for a preliminary injunction, the Commonwealth Court should have "required MSC to show (1) manifest error in the EQB's interpretation of its statutory authority to promulgate the challenged Chapter 78a [r]egulations, (2) a manifest violation of a statutory procedure in promulgating the regulations, or (3) that the [a]gencies' assertions that the regulations are reasonable were made in bad faith, purely arbitrary, or a manifest abuse of discretion." *Id.*

The Agencies additionally fault MSC for failing to call witnesses at the preliminary injunction hearing. They also emphasize that the regulations were formulated during a six-year time period in which voluminous public comments – including comments from other state agencies, DEP's Oil and Gas Technical Advisory Board, experts, stakeholders, and local governments – as well as data from the oil and gas industry were received and taken into account, and that the regulations were published in the *Pennsylvania Bulletin* as an order of the EQB. *See id.* at 30-31.

MSC argues that the Agencies, throughout their brief, employ an incorrect statement of the deference owed to DEP's interpretation of the law. MSC proffers that the Commonwealth Court utilized the proper standard when evaluating the elements for a preliminary injunction, and the Agencies overlay a framework more suited to a final merits assessment of the challenged regulations' validity. *See* Brief for Appellee at 16-17 (quoting *Fischer v. DPW*, 497 Pa. 267, 271, 439 A.2d 1172, 1174 (1982) (noting that, as a preliminary injunction "is designed to preserve the status quo pending final

resolution of the underlying issues," the clear-right prerequisite is not intended to require that a party seeking a preliminary injunction establish its claim absolutely)).

In this regard, MSC indicates that the three-prong test articulated by the Agencies will be applied later in the litigation when the Commonwealth Court decides the Petition's merits, *see id.* at 17 (citing *Rand v. State Bd. of Optometry*, 762 A.2d 392, 394 (Pa. Cmwlth. 2000)), but that for now, it was sufficient for the court to determine that there are substantial, unresolved legal questions. *See id.* MSC adds that, in all events, when applying the first (lawfulness) prong in the context of a challenge to legislative rulemaking, little deference is due to an agency with regard to its reading of the authorizing statute, since administrative agencies have no special expertise in the area of statutory interpretation.

The regulations presently at issue are legislative rules – meaning they establish a controlling standard of conduct. See *Borough of Pottstown v. Pa. Mun. Ret. Bd.*, 551 Pa. 605, 609, 712 A.2d 741, 743 (1998). Such regulations "enjoy a general presumption of reasonableness." *Id.* (citations omitted). *See generally Nw. Youth Svcs., Inc. v. DPW*, 620 Pa. 140, 155-61, 66 A.3d 301, 310-13 (2013) (surveying the different types of agency rules and the deference judicially accorded to each). As MSC notes, however, and because legislative rulemaking "is 'an exercise of legislative power by an administrative agency, pursuant to a grant of legislative power by the legislative body,'" *Popowsky v. PUC*, 589 Pa. 605, 630, 910 A.2d 38, 53 (2006) (quoting *Rohrbaugh v. PUC*, 556 Pa. 199, 208, 727 A.2d 1080, 1085 (1999)), a legislative rule is only valid if it falls within the scope of the rulemaking power granted by the General Assembly. *See, e.g.*, *Rand*, 762 A.2d at 395 (invalidating an agency regulation that exceeded the scope of its legislatively-granted rulemaking powers).

In the context of a motion for a preliminary injunction, only a substantial legal issue need be apparent for the moving party to prevail on the clear-right-to-relief prong. *See SEIU*, 628 Pa. at 590-91, 104 A.3d at 506; *Fischer*, 497 Pa. at 271, 439 A.2d at 1174.[9] This implicates a less deferential standard relative to the agency's interpretation of the governing statute than would be applicable to a trial court's final merits determination.

## B. Standard of appellate review

Appellate courts review a trial court order granting or denying a preliminary injunction for an abuse of discretion. *See Brayman Constr. Crop. v. PennDOT*, 608 Pa. 584, 601, 13 A.3d 925, 935 (2011) (citing *Summit Towne Ctr., Inc. v. Shoe Show of Rocky Mount, Inc.*, 573 Pa. 637, 645, 828 A.2d 995, 1000 (2003)). Insofar as issues of statutory interpretation are concerned, however, our review is *de novo*. *See SEIU*, 628 Pa. at 591, 104 A.3d at 506. Additionally,

> we do not inquire into the merits of the controversy, but only examine the record to determine if there were *any apparently reasonable grounds* for the action of the court below. Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the [decree].

*Brayman*, 608 Pa. at 602, 13 A.3d at 935-36 (emphasis added) (quoting *Roberts v. Bd. of Dirs. of Sch. Dist. of Scranton*, 462 Pa. 464, 469, 341 A.2d 475, 478 (1975)).

---

[9] As an aside, we note that *SEIU* referenced *Fischer* for the position that the party seeking relief need only raise a substantial legal question regarding the parties' rights. For its part, however, *Fischer* suggested that such precept only applies where: (a) there is a threat of irreparable harm; (b) the injunction simply restores the status quo; and (c) greater injury would result by refusing the injunction than by granting it. Regardless, any difference between these two formulations is presently immaterial, as the prerequisites mentioned in *Fischer* are satisfied with regard to the aspects of the Commonwealth Court's order which we presently affirm.

## C. Individual counts

*Public resources (Count I)*

*(i) Playgrounds and common areas on a school's property*

The Agencies argue that the list of public resources appearing in Section 3215(c), which relates to well-location restrictions, is open ended and that "common areas on a school's property or a playground" and "species of special concern" are of the same class and kind as the items expressly enumerated in that subsection.[10] They observe that these terms are defined in the regulations as follows:

> *Common areas of a school's property* -- An area on a school's property accessible to the general public for recreational purposes. For the purposes of this definition, a school is a facility providing elementary, secondary or postsecondary educational services.
>
> *Playground* – (i) An outdoor area provided to the general public for recreational purposes. (ii) The term includes community-operated recreational facilities.

25 Pa. Code §78a.1. The Agencies maintain that they articulated reasons the general public regularly uses playgrounds and common areas of a school's property, and,

---

[10] The provision states:

> **(c) Impact.**--On making a determination on a well permit, the department shall consider the impact of the proposed well on public resources, including, but not limited to: (1) Publicly owned parks, forests, game lands and wildlife areas. (2) National or State scenic rivers. (3) National natural landmarks. (4) Habitats of rare and endangered flora and fauna and other critical communities. (5) Historical and archaeological sites listed on the Federal or State list of historic places. (6) Sources used for public drinking supplies[.]

58 Pa.C.S. §3215(c).

moreover, such resources "share several similar characteristics with parks." Brief for Appellants at 36.

The Commonwealth Court did not disagree. It observed that the Agencies' interpretation of the statute could be overly broad as it might justify the inclusion of such items as shopping centers, movie theaters, sports stadiums, and amusement parks, all of which, per the doctrine of *ejusdem generis*, do not appear to be contemplated by Section 3215(c). *See MSC*, No. 573 M.D. 2016, *slip op.* at 17 n.11. The court additionally noted that the Environmental Rights Amendment relates to the protection of "natural, scenic, historic and esthetic values of the environment," and obligates the Commonwealth to conserve "*public* natural resources." PA. CONST. art. I, §27 (emphasis added). It raised the possibility that the General Assembly intended to conform the list of items appearing in Section 3215(c) roughly to the scope of protection reflected in Article I, Section 27. Under these circumstances, the court concluded a substantial question was raised whether it would be proper to interpret Section 3215(c) as authorizing regulations which subsume *private* resources open to the public, such as playgrounds and common areas of schools, which are not inherently natural, scenic, historic, or esthetic. *See MSC*, No. 573 M.D. 2016, *slip op.* at 17-18 & n.10.

In our view, these observations support the court's determination that a substantial legal question was raised in relation to the challenged regulations' inclusion of playgrounds and school common areas as "public resources" and, concomitantly, the owners of these items as "public resource agencies." That being the case, there is no basis to disturb the Commonwealth Court's determination that MSC established the clear-right requirement relative to this aspect of Count I.[11]

---

[11] In dissent, Justice Donohue expresses that privately-owned recreational lands are "of the same kind or class as publicly-owned parks." Concurring and Dissenting Opinion, *slip op.* at 6 (internal quotation marks and citation omitted). She also indicates that no (continued…)

As noted, the court deemed the irreparable-harm prong to be satisfied due to, among other things, the cost of compliance. According to the RAF, the total cost of compliance will be $888,000 per applicant. *See* RAF at 87, *reprinted in* R.R. 842a. Although some of this cost would be incurred relative to public resources other than playgrounds and school common areas, it is undisputed that the addition of those two items accounts for at least part of the cost. Further, since the Agencies enjoy sovereign immunity, if the challenged regulations are ultimately held invalid, that portion of the cost would not be recoverable by MSC members. Thus, the court reasonably found that MSC carried its burden to demonstrate irreparable harm. *See generally Boykins*, 128 Pa. Cmwlth. at 158, 562 A.2d at 1029 ("The inability to be adequately compensated by an award of damages constitutes irreparable harm." (citation omitted)).

As well, given the Agencies' failure to produce evidence of the harm they would suffer if the challenged provisions were enjoined preliminarily,[12] the court reasonably

---

(…continued)
party has compellingly argued why "impacts on [school common areas and playgrounds] should not be considered in equal measure before the DEP issues a permit[.]" *Id.* at 8.

Our task is not to formulate environmental policy, but to evaluate whether the Commonwealth Court reasonably discerned the existence of a substantial question concerning whether the term "public resources," as it appears in Section 3125(c), is sufficiently expansive to include privately owned land open to the public. In its merits resolution, the Commonwealth Court (and/or this Court) may ultimately agree with Justice Donohue's position that such properties are encompassed by Section 3215(c). In the interim, however, we believe there are "apparently reasonable grounds" to support the Commonwealth Court's determination that a substantial legal issue exists.

[12] In this respect the court observed that, while the specific regulations in issue are designed to provide new and greater environmental protections, the Agencies did not supply evidence that preliminarily enjoining their enforcement would "harm any person, entity, or the public in general." *MSC*, No. 573 M.D. 2016, *slip op.* at 19 n.13.

concluded that, for purposes of the motion, greater injury would result from refusing the injunction than from granting it.[13]  We also see no basis to disagree with the court's explanation that issuing the preliminary injunction, narrowly tailored as appropriate, would not adversely affect the public interest.  Finally, the court reasonably concluded that a preliminary injunction would restore the parties to the status quo *ante*, namely, the absence of any regulation subsuming playgrounds and school common areas within the notice, comment, and mitigation scheme of 25 Pa. Code §78a.15(f).

*(ii) Species of special concern*

As for "species of special concern," the Agencies observe, first, that Section 3215(c)(4) indicates public resources include not only habitats of rare and endangered species, but also "other critical communities" – a phrase that must be given some meaning.  They add that the inclusion, by regulation, of "species of special concern" within the scope of that phrase comports with a long-standing practice whereby well permit applicants use the PNDI database to enable DEP to consider impacts on species of special concern in analyzing applications.  *See* Brief for Appellants at 38-39.[14]

---

[13] MSC asserts the Agencies have waived, by omitting from their brief, any challenge to the preliminary injunction factors dealing with the weighing of harms as between the parties, and the relief being reasonably suited to abate the offending activity.  *See* Brief for Appellee at 30-31.  The Agencies reply that they have not waived any argument regarding harm to the public, as MSC bore the burden of proof on all elements at the preliminary injunction stage.  *See* Reply Brief for Appellants at 6-7, 22.  This argument is non-responsive as it relates to a different factor.  As well, the Agencies overlook that, as appellants, they carry the burden to demonstrate error by the Commonwealth Court.

[14] Section 78a.1 defines other critical communities as follows:

> (i) Species of special concern identified on a PNDI [Pennsylvania Natural Diversity Inventory] receipt, including plant or animal species:  (A) In a proposed status categorized as proposed endangered, proposed threatened, proposed rare or candidate.  (B) That are classified as rare or tentatively undetermined.

(continued…)

MSC suggests that the Agencies' argument is misleading. It maintains that, while use of the PNDI database to identify threatened or endangered species may be a longstanding practice, imposition of mandatory protections for "species of special concern" based on a PNDI receipt is new. *See* Brief for Appellee at 23.[15] It observes that, per Secretary Perry's testimony, the designation of a species as threatened or endangered proceeds from a "rigorous process" which includes notice-and-comment rulemaking, N.T., Oct. 25, 2016, at 153, whereas the same is not true of species of special concern. MSC notes Secretary Perry observed that species of special concern are placed in the PNDI database and designated as such by the jurisdictional agencies, that is, the Agencies with "statutory authority to protect those species," including the Department of Conservation and Natural Resources, the Game Commission, the Fish and Boat Commission, and the Pennsylvania office of the United States Fish and Wildlife Service. *Id.* at 153-54. MSC also emphasizes that Secretary Perry confirmed the rule requiring consideration of species which are neither endangered nor threatened was adopted in 2013 pursuant to a departmental policy, which cannot create law, but is now mandatory under the challenged regulation. *See id.* at 152-54, 159-60.

We need not address whether or how a regulation may make obligations imposed on an applicant depend on the contents of a database which is updated over

(…continued)

(ii) The term does not include threatened and endangered species.

25 Pa. Code §78a.1. A PNDI receipt, in turn, is defined as "[t]he results generated by the [PNDI] Review Tool containing information regarding threatened and endangered species and other critical communities." *Id.*

[15] In its Petition, MSC alleged that, because the PNDI database contents change from day to day, the information on a receipt – including the list of species of special concern – can vary on a daily basis. *See* Petition ¶44(h).

time by other agencies. In finding a substantial legal question, the Commonwealth Court did not focus on that aspect of the challenged provision. Rather, after indicating that species of special concern, as a resource classification, falls below threatened or endangered, *see MSC*, No. 573 M.D. 2016, *slip op.* at 18 – a proposition that is not in dispute – the court centrally highlighted that such classification is not the result of public rulemaking and "does not have any special protection afforded under the laws of this Commonwealth that DEP is entrusted to enforce." *Id.* The Agencies do not contradict the Commonwealth Court's essential observation in this regard, opting instead to highlight their general entitlement to deference and the presence of the statutory phrase, "other critical communities." Thus, the Agencies' argument is not responsive to the Commonwealth Court's reasoning, which, again, relates to whether the Agencies are authorized by statute to include within the permitting process a categorization that no statute expressly obligates DEP to protect.

Without deciding finally whether the absence of statutory authority requiring DEP to protect species of special concern is a valid basis to conclude that the "other critical communities" necessarily excludes that category from the scope of Section 3215(c) of Act 13, we agree with the Commonwealth Court that, at a minimum, a substantial legal issue on this point has been raised. Accordingly, we affirm its determination that MSC has satisfied the clear-right element for preliminary injunctive relief.[16]

---

[16] The dissent characterizes MSC's argument as stating that the PNDI's "use to identify species of special concern is new," and refers to testimony concerning a "long-standing practice" of using the PNDI to identify such species. Concurring and Dissenting Opinion, *slip op.* at 8. The dissent concludes that it was unreasonable for the Commonwealth Court to find a substantial legal issue. *See id.* at 9. Respectfully, the dissent mischaracterizes both the issue and MSC's argument. As discussed, what is "new" is the imposition of mandatory protections for species of special concern based on a PNDI receipt, and the issue arises because their regulatory designation as "other critical communities" did not proceed from notice-and-comment rulemaking.

Further, under the regulations challenged in Count I, the inclusion of species of special concern in the "public resource" category triggers the same notice, comment, and mitigation obligations for the well applicant as were applicable to playgrounds and school common areas. *See* 25 Pa. Code §§78a.1, 78a.15(f), (g)(2). The analysis given above concerning the other preliminary injunction factors applies equally to the species-of-special-concern facet of MSC's challenge. That being the case, the Commonwealth Court had "apparently reasonable grounds" for its action in granting MSC a closely tailored preliminary injunction as to Count I.

*Area of review (Count II)*

In relation to Count II, as discussed, the Commonwealth Court rejected many of MSC's challenges to the area-of-review regulations, *see* 25 Pa. Code §§78a.52a, 78a.73(c) and (d), which require well operators to identify, monitor, and remediate all active, inactive, orphan, abandoned, and plugged-and-abandoned gas and oil wells within a certain distance from the operator's well bore. The court did, however, grant a preliminary injunction with regard to the monitoring and remediation provisions insofar as they gave rise to significant implementation issues by requiring well operators to "trespass" onto others' lands. *MSC*, No. 573 M.D. 2016, *slip op.* at 22.

The Agencies posit that the Commonwealth Court erred by failing to recognize their broad statutory authority under Act 13 and the Clean Streams Law to protect the waters of the Commonwealth and the public from the impacts of drilling – powers which they exercised by promulgating the area-of-review regulations. They refer to Section 3274 of Act 13 in particular as giving the EQB authority to promulgate regulations necessary to accomplish such objectives. *See* Brief for Appellants at 44 (citing 58 Pa.C.S. §3274 (stating that the EQB "shall promulgate regulations to implement" Chapter 32, relating to oil and gas)). The Agencies also note the Clean Streams Law

gives DEP discretion to order landowners to provide access to their land whenever a condition on that land is causing pollution or a danger of pollution. *See id.* at 45 (quoting 35 P.S. §691.316).

In terms of liability for environmental harms, the Agencies observe that the Clean Streams Law provides an independent basis for liability and that such liability can be triggered by causation alone, as opposed to land ownership, thereby undercutting the Commonwealth Court's concern that the regulations are inconsistent with Sections 3220 and 3271 of Act 13. *See id.* at 46 (citing *Commonwealth v. Harmar Coal Co.*, 452 Pa. 77, 306 A.2d 308 (1973)). The Agencies also advert to the large number of abandoned oil and gas wells in this state, the many documented stray-gas-migration investigations that have taken place since 1984, and "geyser-like events" and polluted groundwater that can result from communication between an active unconventional well and an existing oil or gas well. *Id.*[17] Overall, in this regard, the Agencies fault the Commonwealth Court for what they view as an overly narrow interpretation of their authority under Act 13 and the Clean Streams Law. *See id.* at 47.

Notwithstanding the Agencies' arguments, there are reasonable grounds for the Commonwealth Court's determination that a substantial legal question was raised in terms of the monitoring and remediation obligations imposed by the regulations on well operators relative to wells located on other persons' property. The provision of the Clean Streams Law giving DEP power to require entry onto others' land is not only discretionary, it is only triggered by actual pollution or a danger of pollution. The new regulatory mandate to enter onto others' land, visually monitor their wells, and cap their wells if necessary, is far broader. Indeed, the regulations dictate that all identified wells

---

[17] Secretary Perry testified that "the act of fracking a well" can only cause groundwater contamination when a well-communication incident occurs. N.T., Oct. 25, 2016, at 116.

be visually monitored during stimulation activities, although it is not evident how this may be achieved without traversing the lands of others. The Agencies have not brought to our attention a legal basis on which DEP would be authorized to require access onto private land in the case of an inaccessible well which posed no apparent danger of pollution. Further, counsel for the Agencies conceded at the hearing that DEP might not have the authority to require anyone to allow access to their property for well-monitoring purposes. *See* N.T., Oct. 26, 2016, at 358.[18]

Nor is *Harmar Coal* on point. In that matter this Court consolidated two appeals dealing with the obligation of a coal mine operator to treat acid mine drainage (a type of polluted water) before discharging it from its own mine into Commonwealth waters. In one appeal, some of the drainage had its source in adjacent mines and flowed by gravity into the subject mine. In the other, it had to be pumped out of an adjacent mine to avoid destruction of a barrier between the two. *See Harmar Coal*, 452 Pa. at 81, 306 A.2d at 311. In both instances, the statutory language was applicable inasmuch as it covered pollution discharges from the subject mine or from any other mine as needed to enable operation of the subject mine. *See id.* at 100, 306 A.2d at 321. Notably, the

---

[18] The dissent seeks to circumvent this problem by pointing to evidence that pollution could result from a well-communication incident. *See* Concurring and Dissenting Opinion, *slip op.* at 12. It bears noting that the Commonwealth Court acknowledged such potentiality and declined to find a substantial legal issue with regard to it. *See MSC*, No. 573 M.D. 2016, *slip op.* at 24. Instead, the court focused on issues arising from the face of the regulation when considered in light of governing statutory provisions. As discussed, these concerns include such items as: whether a well operator may access and monitor every well owned by others and located on another's property within the area-of-review survey; and whether Section 78a.73(d) is consistent with Act 13's well-plugging requirements, which mandate that well operators plug their own wells. *See id.* at 26. Such issues are not resolved by observing that it is possible for a well-communication incident to occur and to cause pollution.

controversy did not relate to the entry by a mine operator onto the property of another absent ongoing pollution or a known danger – or for visual monitoring purposes.

Given the above, we conclude there are apparently reasonable grounds to support the court's determination that MSC raised a significant legal question in regard to the implementation of the area-of-review requirements.

In terms of the balancing-of-harms inquiry, the Commonwealth Court's analysis is somewhat conclusory. *See MSC*, No. 573 M.D. 2016, *slip op.* at 26. Unfortunately, however, the parties' arguments are not entirely helpful as they are not directly apposite to the grant of *preliminary* relief. MSC notes that the RAF reflects an overall cost to industry of $11 million to comply with the area-of-review regulations, and adds that these costs will be unrecoverable if the regulations are ultimately deemed invalid. Still, that figure appears to be the total cost going forward indefinitely, not the probable cost to be incurred pending a final ruling on the merits. Likewise, the Agencies do not give an expected cost which takes into account the limited timeframe involved. Rather, they maintain there is a non-zero probability of communication between an unconventional well and an existing well, which, if it were to occur, would result in water pollution and substantial cleanup costs.

If such incidents were frequent, the Agencies' argument would carry more weight. According to Secretary Perry, however, they are "not a common occurrence." N.T., Oct. 25, 2016, at 120. Even accepting that the cleanup effort ensuing from a single occurrence would be financially burdensome, *see id.*, absent some indication that there is more than a *de minimus* probability the risk will materialize before MSC's claims are decided (discussed below), we cannot say that the Commonwealth Court lacked any reasonable basis for its conclusion regarding the balancing of harms.

As for adverse effects to the public interest, the Agencies, again, portray that well-communication incidents tend to cause significant environmental harms, particularly if the communication is between an unconventional well and a conventional one. *See* Brief for Appellants at 48. It is self-evident that significant environmental harms have an adverse effect on the public interest. Again, however, such effects only arise from an actual incident. MSC suggests that the record only supports a low probability of this occurring. It argues that, with over 9,000 unconventional wells having been drilled in Pennsylvania, *see* 46 Pa. Bull. No. 41, at 6463 (Oct. 8, 2016), *reprinted in* R.R. 694a (reflecting a figure of 9,486), the record references only five well-communication incidents and of those, only one was between an unconventional well and a conventional one. *See* RAF at 89, *reprinted in* R.R. 844a.[19]

It is not clear from the record whether the five episodes mentioned in the RAF were intended to comprise all such events that have occurred, as they are couched as incidents which DEP chose to analyze for cost-comparison purposes. *See id.* In their reply brief, though, the Agencies do not contradict MSC's assertion that these are the only five which have occurred since unconventional well drilling began, and moreover, the Agencies do not point to any aspect of the record suggesting that more than five incidents have occurred. Under these circumstances, an apparently reasonable basis exists for the Commonwealth Court to conclude that, if a preliminary injunction were to issue, the expected effect on the public interest would be slight due to a low probability of a well-communication incident occurring within the limited timeframe involved.[20]

---

[19] More generally, Secretary Perry testified that communication into abandoned wells is of substantially greater concern for conventional, than unconventional, drillers. *See* N.T., Oct. 25, 2016, at 116-17.

[20] The dissent appears to take the position that the public interest is adversely affected so as to defeat preliminary injunctive relief whenever there is *any* possibility of harm to (continued…)

Finally, we see no basis to disagree with the court's suggestion that the preliminary injunction, narrowed so that it applies only to wells located on the lands of others, restores the parties to their status quo *ante.*  See *MSC*, No. 573 M.D. 2016, *slip op.* at 26-27.

*Impoundments (Count IV)*

Relative to Count IV, the Commonwealth Court preliminarily enjoined, as applied to existing impoundments, Sections 78a.59b(b) and 78a.59c.  Those provisions relate to well-development impoundments and centralized impoundments, respectively.  *See supra* note 7.  As to the latter, Section 78a.59c indicates centralized impoundments must be closed or re-permitted by October 8, 2019, in compliance with the requirements of Title 25, Subpart D, Article IX of the Pennsylvania Code, which relate to residual waste management and were promulgated under SWMA, among other laws.  *See* 25 Pa. Code §78a.59c.

For its part, Section 78a.59b(b), relating to well-development impoundments, has two parts.  It states that operators of unconventional wells must register existing well-development impoundments with DEP.  In pertinent part, it also mandates that any such

---

(…continued)

the environment, no matter how remote or speculative.  *See* Concurring and Dissenting Opinion, *slip op.* at 13 (suggesting a "no effect" test which would not countenance even minimal or speculative risks).  Other courts have eschewed that stance and instead have considered the probable consequences of an injunction.  *See, e.g.*, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) (explaining that, in analyzing the public-interest prong for purposes of a preliminary injunction, courts should not consider effects that are remote or speculative, but should "weigh the public interest in light of the *likely* consequences of the injunction" (emphasis in original)).  Although the dissent quotes general language from *SEIU* reciting the standard formulation for the sixth prong of the governing preliminary-injunction standard, the *SEIU* Court had no occasion to consider whether remote or speculative harms operate to defeat entitlement to preliminary injunctive relief.

impoundments be upgraded to use a synthetic, impervious liner and be surrounded by a fence (unless an individual is continually present) to prevent unauthorized acts by third parties and damage from wildlife. *See* 25 Pa. Code §78a.59b(b), (d), (e).

The primary substantive basis on which interim relief was granted pertains to the circumstance that existing impoundments were built to DEP standards extant at the time, and there has been no change in the governing statutory law which would authorize DEP to retroactively change such standards for impoundments built years ago in reliance on DEP's prior authorization. See *MSC*, No. 573 M.D. 2016, *slip op.* at 32.

Presently, the Agencies do not argue that the authorizing statutes have changed. Instead, they proffer that they retain the authority to change impoundment requirements via the rulemaking process and apply the new requirements retroactively to existing impoundments without violating due process. In this regard, the Agencies distinguish *Young J. Lee*, which the Commonwealth Court quoted, noting that that dispute involved agency action which was adjudicative, rather than legislative, in nature. MSC responds that the Commonwealth Court was appropriately skeptical that the Agencies had newly-discovered powers under statutes that had been on the books for many years and, as such, correctly held that a substantial legal question was raised as to the legality of the regulations. Their argument is consistent with the Commonwealth Court's expression that "Secretary Perry credibly testified that these regulations stem not from a change in the law, but from a change in DEP's interpretation of long-standing law." *MSC*, No. 573 M.D. 2016, *slip op.* at 32.

*(i) Well-development impoundments*

There is little in the record to suggest any reinterpretation of a statute occurred with regard to well-development impoundments, which previously were minimally regulated and were only subject to permitting if at least five acres of earth would be

disturbed. *See* Brief for Appellants at 14-15 (providing background). Rather, Secretary Perry explained that, given the sheer size of the new well-development impoundments used for unconventional wells – ranging up to 30 million gallons – they are essentially in the nature of a dam and, as such, are appropriately regulated under the Dam Safety and Encroachments Act ("DSEA").[21] *See* N.T., Oct. 25, 2016, at 128. According to the record, although these impoundments generally store freshwater, the water may at times include other fluids used in well development which are not indigenous to the local watershed, the escape of which can pose a threat of pollution to the waters of the Commonwealth. *See* RAF at 31, *reprinted in* R.R. 786a.[22]

The Commonwealth Court did not identify a substantial legal issue with regard DSEA's authorization to regulate these impoundments. As noted, the court proceeded from the supposition that the Agencies' interpretation of governing law had changed – a premise that does not apply with regard to well-development impoundments. Absent any particularized contention tending to cast doubt upon the Agencies' position that DSEA allows for such regulations, *see, e.g.*, 32 P.S. §693.5 (generally authorizing the EQB to adopt regulations relating to dams, reservoirs, water obstructions, and encroachments), there is little basis in the present record to believe the Agencies lacked the authority to promulgate Section 78a.59b(b).

Moreover, by enjoining Section 78a.59b(b) without distinguishing between its two parts, the court stayed enforcement of the well-registration requirement, which it never

---

[21] Act of Nov. 26, 1978, P.L. 1375, No. 325 (as amended 32 P.S. §§693.1–693.27).

[22] The Agencies now also allow operators to store and use mine-influenced water in well development impoundments, *see* 25 Pa. Code §78a.59b(h), although it is unclear whether operators requested such ability or find it desirable. The Agencies view such practice as beneficial because it reduces the consumption of fresh water from the Commonwealth's waterways. *See* RAF at 32, *reprinted in* R.R. 787a.

discussed. Also, we are not convinced by the court's reliance on *Young J. Lee* for principles sounding in procedural due process. Instead, we agree with the Agencies that that dispute was unlike the present one insofar as it dealt with adjudicative agency action, namely, the revocation of a license. The promulgation of legislative regulations involves procedural mechanisms absent from adjudications and, as such, is materially different for due process purposes. *See Small v. Horn*, 554 Pa. 600, 613, 722 A.2d 664, 671 (1998) ("It is well settled that procedural due process concerns are implicated only by adjudications, not by state actions that are legislative in character." (footnote and citation omitted)). Nor does the fact that the regulation may affect existing well-development impoundments alone make it constitutionally unsound. *See generally Harmar Coal*, 452 Pa. at 92, 306 A.2d at 316-17 (observing that the state's police power, including regulations maintaining the state's water resources, may be applied to business operations even where doing so causes "the imposition of new costs" (citations omitted)).

Accordingly, we conclude that, at this stage, MSC has not carried its burden to demonstrate a clear right to relief as to Section 78a.59b(b).

*(ii) Centralized impoundments*

The regulation governing centralized impoundments presents a different situation. Secretary Perry testified that the Agencies had not previously regulated them under SWMA on the view that they fell under SWMA's exemption for drill cuttings from well sites. *See* 35 P.S. §6018.103 (defining solid waste to exclude drill cuttings from well sites and, in turn, defining drill cuttings broadly to include rock cuttings and any "related mineral residues created during the drilling of wells" which are disposed of at the well site). He then provided an explanation which, although not entirely clear, appears to reflect that, given DEP's experience with leakage from such impoundments,

the Agencies reconsidered the issue and concluded that centralized impoundments were not, in fact, located at well sites, meaning they could be regulated under SWMA; this was true because, as noted, SWMA's definition of "drill cuttings" only encompasses well-drilling waste processed at the well site. *See* N.T., Oct. 25, 2016, at 134-35. Thus, Secretary Perry indicated that that the Agencies' current position was that their prior interpretation, whereby centralized impoundments escaped SWMA regulation, "was an error." *Id.* at 135. It is on this basis that the Agencies now claim authority to require centralized impoundments to "operate in the same manner as all other residual waste transfer facilities located throughout the Commonwealth." Brief for Appellants at 16.

We do not doubt that leaks from centralized impoundments are potentially harmful to the environment. For present purposes, however, it is not apparent how such occurrences can support the concept that the impoundments are *not* part of the associated well site for SWMA purposes, whereas they *were* part of the well site before it was known that they could leak. This, in turn, gives rise to a substantial legal issue concerning the validity of the Agencies' new interpretation of the scope of SWMA's exclusion of "drill cuttings" from the definition of solid waste. Thus, the Commonwealth Court had an apparently reasonable basis to conclude that MSC had raised a substantial legal question concerning whether SWMA authorizes the promulgation of Section 78a.59c.

As the interim relief was limited to existing centralized impoundments that would otherwise have to be closed or retrofitted, the court left Section 78a.59c in effect relative to any new impoundments. Thus, any harm to the Agencies and the public interest is limited to existing impoundments pending a final resolution on the merits. In terms of irreparable harm from refusing the injunction, the Agencies estimated that well operators would incur costs between $39,000,000 and $65,000,000 to retrofit existing

centralized impoundments. *See* RAF at 98, *reprinted in* R.R. 853a.[23] Therefore, as concerns centralized impoundments, the Commonwealth Court had an apparently reasonable basis to conclude that the injury to MSC from denying the injunction was greater than the harm to the Agencies from granting it, and that granting interim relief would not adversely affect the public interest.

*Site restoration (Count V)*

As discussed, the Commonwealth Court rejected most of MSC's claims regarding the new site-restoration regulations, *see* 25 Pa. Code §78a.65, except that it granted preliminary relief with respect to Section 78a.65(d), which relates to disturbed areas of land that are not included in a restoration plan and impervious surfaces that remain in the post-drilling timeframe. The court found that a substantial legal question had been raised as to whether that provision abrogated an exemption in the Clean Streams Law. *See MSC*, No. 573 M.D. 2016, *slip op.* at 38 ("To the extent Section 78a.65(d) abrogates any requirements or exemptions in [t]he Clean Streams Law, MSC has raised a substantial legal question over its validity.").

The Agencies fault the court for finding a potential conflict between Section 78a.65(d) and the Clean Streams Law, since the identified potential conflict is not with the enactment itself but with Section 102.8(n), a regulation promulgated pursuant to it.

___

[23] The Agencies object that there is no evidence that the monetary cost of denying the injunction would be incurred by MSC members because MSC did not prove that any of its members operate existing centralized impoundments. This argument is waived as the Agencies did not advance it before the Commonwealth Court, *see MSC v. DEP & EQB*, No. 573 M.D. 2016, Brief in Opposition to Application for Expedited Special Relief, at 36-40, and effectively assumed that MSC members would be affected. *See, e.g., id.* at 38 (referring to a three-year sunset provision for decommissioning centralized impoundments and proffering that during that period "MSC members can use these impoundments and may even apply for permission to keep using them").

The Agencies argue, as well, that Section 78a.65(d) does not conflict with the regulation. Rather, they maintain that, as expressed in the RAF, the purpose of Section 78a.65(d) is merely "to provide clarity between site restoration under Chapter 78[a] and compliance with Chapter 102." RAF at 38, *reprinted in* R.R. 793a, *quoted in* Brief for Appellants at 59 (alteration supplied by Appellants).[24] Separately, they also proffer that, even if an irreconcilable conflict existed between the two regulations, Section 78a.65(d) would nonetheless be enforceable as Section 102.8(n) is a general provision, whereas Section 78a.65(d) is a special provision enacted later in time.

In response, MSC highlights that Act 13 requires erosion and sediment control measures to be implemented in accordance with the Clean Streams Law. *See* Brief for Appellee at 51 (citing 58 Pa.C.S. §3216). MSC continues that "Section 78a.65(d) cannot 'trump' the Cleans Streams Law regulation," *id.*, and argues that the mere possibility of a conflict is sufficient to raise a substantial legal issue for preliminary injunction purposes. Notably, MSC does not reference any provision of the Clean Streams Law with which Section 78a.65(d) is purportedly in conflict.

---

[24] The RAF's explanation in this regard elaborates that Section 78a.65(d) is

> needed to distinguish between (1) "areas not restored" – areas not included on the restoration plan and other remaining impervious areas and (2) areas restored to meadow in good condition or better or areas that otherwise incorporate antidegradation best available combination of technologies (ABACT) or nondischarge PCSM best management practices (BMPs). "Areas not restored" do not fall within the provisions in §102.8(n) and therefore must meet the requirements, inter alia, of §102.8(g). "Areas not restored" include areas where there are permanent structures or impervious surfaces, therefore runoff produced from these areas must be tributary to permanent PCSM BMPs to ensure the runoff will be managed in accordance with the requirements of §102.8.

*Id.*

Unlike with some of the prior counts, the Commonwealth Court's grant of partial interim relief as to Count V was not based on any identified deficiency in the Agencies' statutory authorization to promulgate the rule in question. Rather, the court discerned that a potential conflict existed between Section 78a.65(d) and either the Clean Streams Law or Section 102.8(n)'s limited exemption from compliance with Section 102.8(g)'s additional requirements for a PCSM developed pursuant to the Clean Streams Law.

As we read the two regulatory provisions, it does not appear that a conflict exists. Section 78a.56(d), on its face, only applies to impervious surfaces and disturbed areas which are *not* included in a site restoration plan, whereas the exemption reflected in Section 102.8(n) applies to a certain portion of a site restoration plan. Additionally, no Clean Streams Law provision has been identified that may be in conflict with Section 78a.65(d). At most, there may be an incongruity between two regulations – Sections 102.8(n) and 78a.65(d) – but only in the sense that the latter narrows the scope of circumstances in which the former applies. This in itself would be insufficient to show that Section 78a.65(d) is in conflict with (or unauthorized by) a legislative enactment.

Even if we assume, for decisional purposes, that an irreconcilable conflict exists between the two regulations, it is clear that Section 78a.65(d) must prevail. As the Agencies point out, Section 102.8(n) applies generally to a number of regulated activities that require site restoration, whereas Section 78a.65(d) applies specifically to unconventional gas well sites. Further, Section 78a.65(d) was enacted later in time than Section 102.8(n). Under these circumstances, Section 78a.65(d), being more specific, takes precedence over Section 102.8(n). *See* 1 Pa.C.S. §1933 (reflecting that, with an irreconcilable conflict between a general statute and a special statute enacted later in time, the special statute prevails over – and is construed as an exception to – the general one). *See generally Saturday Family LP v. Commonwealth*, 148 A.3d 931,

935 (Pa. Cmwlth. 2016) (indicating that the rules of statutory construction apply to regulations in the Pennsylvania Code).

Accordingly, we conclude that MSC has not demonstrated a clear right to relief in relation to Section 78a.65(d).

## D. Alleged drafting errors and overbreadth of the order

Appellants raise two additional issues. They indicate that the Commonwealth Court's order refers to the wrong section numbers of some of the regulations being preliminarily enjoined due to typographical errors. Second, they assert that the relief ordered in Count IV, relating to impoundments, was overbroad in that it failed to leave in place the mandate that well operators register well-development impoundments with DEP – an aspect of Section 78a.59b(b) which was not challenged. *See* Brief for Appellants at 64-65.

Both issues are moot. The Commonwealth Court amended its order to address the drafting errors Appellants have identified. Indeed, Appellants include the amended order (in which the typographical errors are corrected) as an appendix to their brief. In terms of the court's failure to leave in place the impoundment-registration provision, any such omission on the court's part is now immaterial in light of our decision to reverse the order insofar as it enjoins enforcement of Section 78a.59b(b).

## III. Conclusion

For the reasons given above, we affirm in part and reverse in part the order of the Commonwealth Court. We affirm the grant of preliminary injunctive relief as to Counts I and II. As for Count IV, we affirm the grant of relief as to Section 78a.59c, but reverse the grant of relief as to Section 78a.59b(b). Finally, we reverse the grant of preliminary injunctive relief as to Count V.

Justices Baer, Todd, Dougherty, Wecht and Mundy join the opinion.

Justice Donohue files a concurring and dissenting opinion.